22 N.J. Super. 477 (1952)
92 A.2d 89
RUTH GALLER, INDIVIDUALLY, ETC., PLAINTIFF-RESPONDENT,
v.
CHARLES SLURZBERG, AND OTHERS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1952.
Decided October 29, 1952.
*481 Before Judges McGEEHAN, BIGELOW and SMALLEY.
Mr. Joseph A. Davis argued the cause for the respondent (Mr. William A. Kaufmann, attorney; Messrs. O'Mara, Schumann, Davis & Lynch, of counsel).
Mr. Abraham J. Slurzberg argued the cause for the appellants (Mr. August W. Heckman, attorney).
*482 The opinion of the court was delivered by BIGELOW, J.A.D.
The plaintiff is the primary distributor of a beverage known as "7 Up," in the counties of Hudson, Bergen and Passaic. The defendants are, or were, 27 sub-distributors, each supplying the retailers in his assigned territory. Relations between plaintiff and defendants were regulated by a contract which had been executed in the interest of the latter by Local No. 560 of the Brotherhood of Teamsters. The plaintiff in the early months of 1952 conceived that the defendants had breached the contract in material respects, and had entered into a conspiracy which threatened to destroy her business. Thereupon, on March 10, 1952 the plaintiff notified defendants that she terminated the contract and two days later she instituted this action for damages.
The defendants retaliated by picketing the plaintiff's plants in Hackensack and Hoboken, and engaging in other activities of a kind commonly associated with labor disputes. On the plaintiff's motion, the court, by order dated May 9, 1952, permitted her to file a supplemental complaint setting forth these alleged facts and praying an injunction against the picketing and other activities. The supplement was filed and, after due argument, a temporary injunction was granted by order dated May 23, 1952. From these two orders the defendants appeal.
Interlocutory orders granting injunctions are appealable and so are interlocutory orders in a few other classes, but in general appeals cannot be taken from interlocutory orders. Rossbach v. Evening News Pub. Co., 3 N.J. Super. 143 (App. Div. 1949). An order for leave to file a supplemental pleading is not appealable and therefore the appeal from the first order mentioned will be dismissed.
But defendants urge that, on the appeal from the injunction order, the propriety of the other order should be considered. It is the established rule that an appeal from a final judgment brings before the court antecedent orders which involve the merits and affect the judgment. Clock v. *483 Public Service Coord. Transport, 8 N.J. Super. 20 (App. Div. 1950). And see 5 C.J.S., Appeal and Error, § 1492. While we are skeptical that this rule is here applicable, we will assume that it is and will consider whether the order allowing plaintiff to file the supplemental complaint was erroneous.
The system of equity jurisprudence that we derived from England permitted only a single subject of litigation, or a single, closely related group of causes for complaint, to be embraced in one suit. If there existed two or more separate and distinct controversies between the parties, several suits must be employed to solve them. A multifarious bill was demurrable. Emans v. Wortman, 13 N.J. Eq. 205 (Ch. 1860); Story, Equity Pleading, § 271. A cross-bill had to be confined to the subject of the original bill. Kirkpatrick v. Corning, 39 N.J. Eq. 136 (Ch. 1884), affirmed 40 N.J. Eq. 343 (E. & A. 1885). A supplemental bill was used to set up facts that occurred after the filing of the original bill, but it was not permissible by a supplemental bill to make a new and different case upon new matter. Story, Equity Pleading, § 616. Now, in the cause before us it appears that the acts of defendants alleged in the original complaint, as well as those stated in the supplemental complaint, had a common purpose and were parts of a single design, namely, to induce the plaintiff to agree to a change in her contract with the defendants in order that there should be a greater spread between defendants' purchase and resale prices. It is likely that even under the standards observed before enactment of the 1915 Chancery Act, the facts alleged in the supplemental complaint could have been brought before the court by a supplemental bill. Williams v. Winans, 22 N.J. Eq. 573 (E. & A. 1871).
In the course of the years, the idea has developed of joining all controversies between the same parties in a single action, where that course can conveniently be adopted, without producing a record so complicated as to impede justice. Rule 3:18 permits an unlimited joinder of claims, *484 or causes of action, in an action by a single plaintiff against a single defendant. For example, action on a note and a suit for personal injuries arising from negligence may be joined in one action, although the court, in its discretion, may order a severance. When there are several defendants and all are proper parties to each claim, claims may be joined as freely as if there were only one defendant. We have had a similar broadening of the scope of counterclaims. A defendant may file a counterclaim that is entirely unrelated to the original complaint. Rule 3:13-1. Our rule as to cross-claims by one defendant against another is even broader than the corresponding federal rule. Any cross-claim may be asserted. Rule 3:13-6. Moore's Federal Practice, §§ 18.04, 13.18 and 13.32.
Supplemental complaints are not the express subject of any of our court rules but are comprehended in Rule 3:15-4 which provides that, by leave of the court, a party may "serve a supplemental pleading setting forth transactions or occurrences which have happened since the date of the pleading sought to be supplemented." Interpretation of the rule should be influenced by the general principle that all controversies between the parties may be determined in a single action. Professor Moore states his opinion:
"While the matters stated in a supplemental complaint should have some relation to the cause of action set forth in the original pleading, the fact that the supplemental pleading technically states a new cause of action, should not be a bar to its allowance but only a factor to be considered by the court in the exercise of its discretion." Moore's Federal Practice, §§ 15, 16.
We are satisfied that there was no error in allowing plaintiff to file the supplemental complaint.
The interlocutory injunction was granted after argument upon the return of an order to show cause which had not been served upon the defendants themselves, but had been served upon the attorney who had appeared for them. When we say that the attorney had appeared for the defendants, we mean he had appeared in the litigation depending upon the original complaint; there had been no occasion for an *485 appearance upon the supplemental complaint, and it was on the supplemental complaint that the order to show cause and the injunction were based. Immediately that the order to show cause was moved, counsel for defendants objected that he was not the agent of the defendants in the controversy set forth in the supplemental complaint, and that the service upon him was invalid. His objection was overruled, whereupon he presented answering affidavits and argued the motion for an injunction on the merits.
Defendants now reiterate that service of the order to show cause was insufficient and plaintiff responds that any defect in the service was cured by the general appearance of the defendants.
Our Rule 3:12-2, copied from Federal Civil Rule 12(b), 28 U.S.C.A., ordains that an objection for insufficiency of service of process and lack of jurisdiction over the person, is not waived by being joined in an answer or motion with other defenses or objections. Special appearances are no longer necessary. In the federal courts it is settled that a defendant's voluntary appearance in the action does not prejudice his objection to the lack of jurisdiction over his person, provided the objection is raised in the answer or before answering. Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871 (3 Cir., 1944). And where the objection is overruled, it has long been the federal doctrine that the defendant may contest the action on the merits and, if eventually defeated, can argue the question of jurisdiction over the person on the appeal from the final judgment. Harkness v. Hyde, 98 U.S. 476; 25 L.Ed. 237 (1879).
While Federal Rule 12(b) has been adopted in New Jersey, we have also a rule, without counterpart in the federal system, providing that a general appearance shall have the same effect as if the defendant had been properly served. Rule 3:4-6. Obviously this rule and Rule 3:12-2(2) must be read together. Where a party, before raising his objection to jurisdiction over the person, by motion or answer, *486 takes any step that operates as a general appearance, he thereby waives his objection to the jurisdiction. Trautman v. Higbie, 10 N.J. 239 (1952). But if he first raises the question by motion or objection or answer under Rule 3:12-2(2) and thereafter appears generally, he does not waive his jurisdictional point. Cf. Swanson v. Swanson, 10 N.J. Super. 513 (App. Div. 1950), affirmed 8 N.J. 169 (1951).
The rule that we have been discussing, Rule 3:12-2, applies expressly only to defenses to a claim for relief in a pleading, and not to a defense to an interlocutory motion such as is now before us. But in our opinion the principle that an objection for lack of jurisdiction of the person is not waived by being joined with a meritorious defense, should be extended and applied to the defenses raised in opposition to a motion for an injunction. Defendants did not waive their objection to the jurisdiction by going into the merits of the motion.
It may be questioned whether the granting of an interlocutory injunction, without notice to a defendant who is domiciled within the State, violates our concept of due process of law. For conflicting views, see 28 Am. Jur., Injunction, § 257; Anno. 69 A.L.R. 1038; Franz v. Franz, 15 F.2d 797 (8 Cir., 1926), and Brooklyn, etc., Club v. Pasquel, 66 F. Supp. 117 (D.C. Mo. 1946). As to constitutionality of ex parte injunctions, see 16 C.J.S., Constitutional Law, § 613. The New Jersey practice is considered in Buchman v. Smith, 136 N.J. Eq. 246 (Ch. 1945), affirmed 137 N.J. Eq. 215 (E. & A. 1945). We will not, however, go into that problem but will direct our attention to the question whether indeed the service was defective of the order to show cause why an injunction should not issue.
The agency of the attorney of record for a party in a court action extends to all procedural matters that may arise in the action pursuant to the established practice of the court in which the action is pending. 7 C.J.S., Attorney and Client, § 83. When a party elects to appear by an *487 attorney, he, of necessity, makes the attorney his agent to that extent. Our rules direct that whenever "service is required or permitted to be made upon a party represented by an attorney the service shall be made upon the attorney unless service upon the party himself is ordered by the court." Rule 3:5-2. This applies not only to service of papers which are relevant to the original causes of action stated in the complaint but to any other causes brought in by counterclaim, cross-claim or supplemental pleading. Service of the order to show cause upon the defendants' attorney in the matter before us, was good service.
The defendants urge that the controversy between the parties is a labor dispute within the meaning of N.J.S. 2A:15-51(e) and other sections of our Anti-Injunction Act, that is, sections 51 to 58 of the cited title and chapter; and that they are entitled to all the safeguards and advantages conferred by the act. The validity of the argument depends upon the relation between the parties. Were the defendants employees of the plaintiff within the purview of the statute? Or were they independent contractors?
The nature of the relation between the parties is to be determined from a consideration of the rights and obligations and methods of operation prescribed by the contract or deducible from the day-by-day conduct of the business as recited in the affidavits and the depositions. 56 C.J.S., Master and Servant, § 2. The choice by the parties of a particular word to characterize the status of the defendants,  "employees" or "agents" or "independent contractors"  is not at all decisive. El v. Newark Star-Ledger, 131 N.J.L. 373 (Sup. Ct. 1944); Electrolux Corp. v. Board of Review, 129 N.J.L. 154 (E. & A. 1942). The most important single factor in the determination whether a man is an employee or an independent contractor, is the existence of the right or lack of the right of the employer to control and direct the manner in which the other party shall carry on his work. Errickson v. F.W. Schwiers, Jr., Co., 108 N.J.L. 481 (E. & A. 1932); Toner v. International Ass'n., *488 etc., 113 N.J.L. 29 (E. & A. 1934). The relation of master and servant might be found not to exist between certain persons for the purpose of one legal problem, say, respondeat superior, and yet the relation might be considered to exist between the same persons at the same time for some other purpose, unemployment compensation, for example. Natl. Labor Relations Board v. Hearst Pub., 322 U.S. 111, 64 S.Ct. 851 (1943); Walling v. American Needlecrafts, 139 F.2d 60 (6 Cir., 1943). The assumption that there is an economic disparity between employer and employee and an inequality of bargaining power, lies in the background of our labor law generally and especially of such statutes as the one under consideration. Teller, Labor Disputes, § 59. The similarity or dissimilarity of the defendants' position to that of the generality of workmen involved in a labor dispute should be considered in determining whether or not the defendants are employees within the design of the statute, although, of course, it is not a controlling circumstance.
Now let us look to the facts. The contract, a dozen printed pages, provides that: The distributors (defendants) are engaged in the business of buying 7 Up from the Company (plaintiff) for resale to retailers at "authorized" prices. In the event a distributor defaults in any of his obligations under the contract, "the Company and the Union may terminate this contract as to the individual distributor involved." "The distributors are and shall be independent contractors and not employees." They shall operate at their own cost their own delivery trucks of a make and design agreed upon by the parties. They shall use the trucks exclusively for the distribution of the beverage. Each distributor shall add an additional truck whenever his annual sales exceed 35,000 cases. The additional trucks shall be operated by "distributor employees suitable to both parties." When the company requires the painting of a truck, it will pay half the cost. Deliveries will not be required on certain specified holidays, and on days when the temperature sinks to 19° at 8 A.M. The company will furnish uniforms which the distributors *489 must wear. The distributors shall devote their entire business hours and energy to the business. They shall each be assigned a vacation period of two weeks each year. In case of the death of a distributor, his legal representative may designate a person "suitable to both parties" to take over his territory.
The distributor shall not "over-supply a customer" or prefer one retailer to another. He must "service his trade" at least once a week. He shall make a daily report of sales, showing names of buyers, etc. He must promptly notify the company of the opening of new accounts. He must report any complaint, no matter how trivial, made by a retailer, relative to the sale of the beverage. The distributor "shall at all times aid, assist and cooperate with the company counsellors in advancing the sale of the beverage." He must keep all advertising matter supplied by the company displayed at all stores serviced by him. The distributor and his employees shall attend all weekly sales meetings.
The affidavit of the defendant Borelli states that he has been "under the direct supervision and control of a supervisor employed by the company, and at all times I have had to obey his orders and directions * * *. All sales made by me must be on a sales slip furnished by the company, which read Galler 7-Up Bottling Company, and if a customer makes payment by check, the check is made payable to" the company.
Another defendant, Carlson, gives in detail a typical day's operation. From his affidavit we quote:
"I must report at the company's plant each morning (except Saturday and Sunday) not later than 8:00 a.m. * * * I must report personally to (Allick Ellis) the supervisor under whose directions I operate. * * * At that time my appearance is given a personal inspection by Mr. Ellis to see that I am wearing the 7 Up regulation uniform * * *. I am examined by him to see if I have shaved, to see if my shoes are shined and to see if my tie is properly tied. Mr. Ellis directs me and the others not to wear a shirt or trousers for more than two consecutive days, without laundering, during the summer months. When I report to Mr. Ellis he then informs me as to whether or not a supervisor is to accompany me that day. After I pass Mr. Ellis' inspection, I go to *490 my truck which is already loaded by the other employees of the Galler 7 Up Bottling Company, and count the number of cases on my truck * * *. I must sign a load sheet for that number of cases. * * *
Immediately outside the company cashier's office there is a metal cabinet with drawers marked and assigned by the company with my name and the names of the other distributors. In each respective distributor's drawer are five route books, one for each working day, numbering from one to five inclusive. These books had been marked by Mr. Ellis and are the property of the company. I am not permitted to take the book home at the end of the day, but must turn it in to the company cashier at the time my returns are made. The route books indicate the names and addresses of the companys' customers. I am directed not to vary the sequence or order in which the various stops are to be made; in other words, I must make the deliveries in the order in which the names of the customers appear in the route book. * * *
When the supervisor comes in my truck, he asks me as to the load for the day, and as to how many cases were sold by me on the same day of the previous week. He also asks me when my truck was last washed, and looks over the interior of the cab, having previously inspected the exterior, and if there is any glass cracked, that the same be replaced. * * * When we arrive at the first store stop, I open the store door for the supervisor and he proceeds me into the store. The company regulations provide that I greet the storekeeper by saying, "Good morning  7 Up man is here."
My complete operations during the day are under the supervisor's direct control and supervision. * * * I am cautioned against getting back to the plant too early, but am definitely instructed not to get back later than 4:00 p.m. in the slow months and 4:30 p.m.  5:30 p.m. in the peak summer months. Mr. Ellis told me that my truck would not even be loaded if I got back later that the times specified. * * * I then go to the cashier where my daily sales are computed, less credit sales, and I turn over the money, less commissions, to the company. The signed credit slips are turned over to the cashier who then gives me an amount in cash, covering such sales. I have nothing further to do with the sales made to the credit customers."
The depositions of the plaintiff's supervisors present a picture of the relationship not differing too greatly from that set forth above. Each supervisor has nine or ten distributors under him and goes out with one of them each day. One supervisor, Blumetti, asked what he would tell the man he was accompanying, answered, "I don't tell him anything. I just suggest to him as I go along if I see anything that *491 needs suggesting." But later on he mentioned, "We always instruct him to try," etc. Another supervisor, Ellis, questioned as to his duties, said, "We are to go out with the men, supervise them to the best of our ability." And added that he acted as a link in transmitting to the distributors "instructions or orders or interpretations of policies or practices" that emanated from the general manager.
The defendants assert and the plaintiff denies that she controlled the manner in which they carried on the work. The difference between them is largely one of words. Did plaintiff's representatives give orders or did they merely make suggestions? We have no doubt that both the supervisors and the defendants considered that the "suggestions" of the supervisors had the force of commands and must be obeyed or the defendants would be in trouble. No instance of disobedience has been called to our attention. The union, in behalf of the defendants, had agreed that they would at all times cooperate with the plaintiff's counsellors in advancing the sale of "7 Up." On the record before us, plaintiff controlled in unusual detail the manner and methods of the defendants. And she exercised this control as of right.
In our consideration of the factual basis for the interlocutory injunction, we have accepted as true whatever full, explicit and circumstantial statements are contained in the defendants' affidavits if they are not inherently improbable, and are responsive to the complaint, even though they be contradicted by plaintiff. Heine's, Inc., v. Truck Drivers', etc. Local, 129 N.J. Eq. 308 (E. & A. 1941). "The court does not attempt to sift out the truth from conflicting ex parte affidavits." Isolantite, Inc. v. United Electrical, etc. Workers, 130 N.J. Eq. 506 (Ch. 1941), modified 132 N.J. Eq. 613 (E. & A. 1942).
The relation between the parties would appear to be typical of master and servant except, perhaps, in three respects: The defendants furnished their own delivery trucks; they, or some of them, had one or two employees of their own, and they were paid  in form at least  no wages.
*492 (1) The question of wages: Note first that the transactions between defendants and plaintiff do not seem to have been purchases by the defendants, despite the written contract. Every afternoon each defendant would leave his truck at the plaintiff's place of business, where it would be loaded for the next day's business by other employees of plaintiff. A defendant did not order so many cases of "7 Up"; he received for his route whatever the management decided he should have. He did not pay for the beverage. We gather that the sales slips, provided by plaintiff, indicated a sale directly by plaintiff to the retailer; that checks given by retailers were made payable to plaintiff, and that charge memoranda showed the retailer to be indebted to plaintiff and not to one of the defendants. When the day's work was over each defendant returned the cases he had not sold, and he turned over to the cashier the money, checks and signed charge slips for his sales. He retained for himself, however, or the cashier paid him, 20 cents for each case sold either for cash or credit. Plaintiff assumed full responsibility for the credits. No wonder the men spoke of the 20 cents as a sales commission. Compensation measured by the results achieved by the servant is, of course, a common incident in master and servant cases.
The delivery trucks: It is not usual for boss carpenters to furnish hammers and other small tools for their employees; the journeymen supply their own tools. In the plumbing trade the opposite custom prevails. When we come to more expensive instruments the fact that the so-called employee provides them is some indication that he is, in reality, an independent contractor. But of course it is not a decisive indication. In Fitzpatrick v. Haberman, 16 N.J. Super. 490 (App. Div. 1951), the employee, a janitor, "supplied his own brushes and equipment and on a few occasions employed a helper." And there have been so many instances of employees furnishing teams and trucks, that not much weight can be attached to the circumstance. In Brown v. Paterson Central Market Assn., 5 N.J. Misc. 1035 (Sup. Ct. *493 1927), a workmen's compensation case, it was held that deceased was an employee of the association, though he furnished his own truck. Similar decisions are Auer v. Sinclair Refining Co., 103 N.J.L. 372 (E. & A. 1927); American Carrier Corp. v. Avigliano, 123 N.J.L. 490 (Sup. Ct. 1939); Brown v. Kremer, 124 N.J.L. 242 (Sup. Ct. 1940); and Mayo v. Hunt's Theatres, 1 N.J. Super. 8 (App. Div. 1948). For cases from other states, see Annotation at 120 A.L.R. 1031.
The sub-employees: The circumstance that the defendants, or some of them, had helpers, paid by them, is also an indication that the defendants were independent contractors; and again the indication, while stronger than the delivery trucks, is not decisive. Lewis v. National Cash Register Co., 84 N.J.L. 598 (Sup. Ct. 1913), is a case strikingly like the one before us in important respects:  A sales agent, paying his own expenses, supplying his own automobile and furnishing his own staff, was held to be an employee and not an independent contractor. The court put especial emphasis not only on the control exercised by the employer, but on the fact that the sales agent had agreed to devote his entire time to the enterprise. And see Burdick v. Liberty Motor Freight Lines, 128 N.J.L. 229 (Sup. Ct. 1942); Fitzpatrick v. Haberman, supra; and Re Murray, 130 Me. 181, 154 A. 352; 75 A.L.R. 721 (Me. Sup. J. Ct. 1931). In the mining industry and especially anthracite mining, it has long been fairly common for the miners to hire their own helpers, and yet the miners are considered employees. Kelley v. Delaware, L. & W.R.R., 270 Pa. 426, 113 A. 419 (Pa. Sup. Ct. 1921); Gailey v. State, etc., Fund, 286 Pa. 311, 133 A. 498 (Sup. Ct. 1926); American Employers Ins. Co. v. Grabert, 39 N.M. 173, 42 P.2d 1116 (N.M. Sup. Ct. 1935); Walling v. Woodbine Coal Co., 64 F. Supp. 82 (D.C. Ky. 1945).
Giving weight to all the circumstances, and especial force to the detailed control of the defendants that was exercised by the plaintiff and her management staff, we find that the relation of employer and employees existed between *494 the parties. It follows that the injunctive order must be set aside and the record remanded for further proceedings in harmony with the Anti-Injunction Act. When the taking of oral proofs upon controverted issues shall be completed, if it still appears that the defendants were employees within the intent of the statute and that a labor dispute exists, there can be no injunction against picketing plaintiff's plants, although there may be an injunction if the proofs warrant, against violence, misleading signs, and other unlawful conduct. We intimate no opinion whether picketing is unlawful per se if the defendants were not employees. See Teller on Labor Disputes, § 134.
The appellants are entitled to costs.