27 N.J. Super. 139 (1953)
99 A.2d 164
RUTH GALLER, INDIVIDUALLY, ETC., PARTNERS TRADING AS GALLER 7 UP BOTTLING COMPANY, PLAINTIFFS-RESPONDENTS,
v.
CHARLES SLURZBERG, ET ALS., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 8, 1953.
Decided August 7, 1953.
*141 Before Judges GOLDMANN, SMALLEY and SCHETTINO.
Mr. Abraham J. Slurzberg argued the cause for appellants (Mr. August W. Heckman, attorney).
Mr. Joseph A. Davis argued the cause for respondents (Mr. William A. Kaufmann, attorney; Messrs. O'Mara, Schumann, Davis & Lynch, of counsel).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendants appeal from an order dated January 26, 1953 granting plaintiffs (hereinafter referred to as "the company") an interlocutory injunction restraining them from picketing at or near the premises of any of the company's customers.
The company holds an exclusive franchise for the bottling and distribution of a carbonated beverage known as "7 Up" in the Counties of Hudson, Bergen and Passaic. On February *142 15, 1950 it entered into an agreement with Local No. 560, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L., as the collective bargaining agent for the 27 individual defendant sub-distributors, governing the terms, conditions, rules and regulations under which each of them was to distribute and service 7-Up to retailers in his assigned territory. The agreement became operative June 1, 1950 and by its terms was to continue in effect until January 31, 1956, unless sooner terminated. In the early months of 1952 the company conceived that defendants had breached the contract in material respects and had entered into a conspiracy which threatened to destroy its business. Accordingly, on March 10, 1952 it served written notice on defendants of the termination of the contract. Two days later plaintiffs instituted this action seeking rescission of the agreement, $250,000 damages for breach of contract, and an additional $250,000 for losses occasioned by the alleged conspiracy.
Defendants retaliated by picketing the company's Hoboken and Hackensack plants and engaging in other activities of a kind commonly associated with labor disputes, among them approaching its customers (the company has 11,000 retail outlets) and telling them that the defendant distributors were on strike, and also picketing the customers' places of business. On motion the court, by order dated May 9, 1952, permitted the filing of an amendment and supplement to the complaint setting forth these alleged facts and demanding judgment restraining defendants' picketing and other activities. Such a pleading was filed and, after argument, an interlocutory injunction was granted on May 23, 1952. The order recited that defendants were independent contractors, the provisions of the Anti-Injunction Act (N.J.S. 2A:15-51 et seq.) inapplicable, and defendants guilty of tortious conduct which had caused and, if continued, would cause substantial and irreparable injuries to the company. It then went on to restrain defendants from picketing at or near the company's plants in Hackensack or Hoboken and also, among other things,
*143 "(i) from displaying placards containing legends stating or implying that Local 560, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L., is connected with the defendants in their controversy with plaintiffs, or that plaintiffs are unfair to organized labor, or that plaintiffs have locked out the defendants;

* * * * * * * *
(k) from picketing at or near the premises of any of the plaintiffs' customers;"
Defendants thereupon appealed from the two orders of May 9 and 23. In Galler v. Slurzberg, 22 N.J. Super. 477 (October 29, 1952), the Appellate Division held that (1) there was no error in allowing the company to file the supplemental complaint, and (2) the relation of employer and employees existed between the parties, and therefore the injunctive order must be set aside and the record remanded for further proceedings in harmony with the Anti-Injunction Act. The court said:
"* * * When the taking of oral proofs upon controverted issues shall be completed, if it still appears that the defendants were employees within the intent of the statute and that a labor dispute exists, there can be no injunction against picketing plaintiff's plants, although there may be an injunction if the proofs warrant, against violence, misleading signs, and other unlawful conduct. We intimate no opinion whether picketing is unlawful per se if the defendants were not employees. * * *" (at page 494)
Following the coming down of the mandate, the Chancery Division began taking oral proof. The hearings started December 1, 1952 and continued on January 8 and 13, 1953, with the next session scheduled for January 28. On January 15, 1953 some of the defendants began to picket two of the company's retail outlets, the Grand Union and the Acme supermarkets in Ridgewood, N.J. On Saturday, January 17, the company's attorney moved ex parte before the judge who had been taking testimony pursuant to the mandate, to obtain an order to show cause why an interlocutory injunction or, in the alternative, a temporary restraining order should not issue restraining defendants from picketing at or near the *144 premises of any of the company's customers. The order was granted, returnable the following Monday, January 19, and was served upon defendants' attorney at his home that Saturday evening.
On the return day defendants' attorney objected to the proceedings, claiming he was not ready to meet the application on such short notice and the matter went over to the next day, Tuesday, January 20, after the testimony of one witness had been taken by consent. That same day (January 19) counsel for plaintiffs gave notice that he would apply the next morning on behalf of the Grand Union Company for leave to intervene as plaintiff for the sole purpose of restraining defendants' picketing at or near its premises. The notice was served on defendants' attorney that evening. On Tuesday morning the trial court permitted the filing of the intervenor's complaint, over objection. The application for injunctive relief was held until that afternoon after objection by the attorney for defendants that they were entitled to notice under the Anti-Injunction Act, that he had not had adequate opportunity to confer with them, and that there was nothing before the court to inform the individual defendants as to what they were being charged with. Following the noon recess and further argument, both plaintiffs' and intervenor's applications were carried to Friday afternoon, January 23.
In the interim the intervenor filed an amended complaint and defendants served notice that they would move to dismiss it on January 23, 1953. On that date defendants again objected to any further proceedings, the chief ground being that there was no complaint before the trial court with reference to any specific acts committed by any of the defendants subsequent to the filing of the supplemental complaint upon which the company was seeking ad interim relief. The court overruled these objections and proceeded to take oral proof which established that some of the defendants had picketed the Grand Union and Acme supermarkets in Ridgewood on January 15, 1953, the A & P market in Hoboken on January 17, the A & P, Safeway and Acme *145 markets in Jersey City on January 17, and the Grand Union in Ridgewood again on January 22. The testimony was corroborated by photographs admitted in evidence and appearing in the appendix. Defendants' attorney continued his objection to the taking of testimony, but nevertheless cross-examined all witnesses for the company and the intervenor. No witnesses were produced on defendants' behalf, nor did any of the individual defendants take the stand although the uncontradicted testimony indicated that more than half of them had been active participants in the various acts of secondary picketing.
Generally, the picketing consisted of (1) the parking of one or more of defendant distributor's trucks in front of a market, the trucks bearing a sign reading "9 Months Lock-Out  Help Us Get Our Job Back  Galler 7-Up Unfair to Labor  Don't Buy 7-Up"; and (2) one or more of the defendants walking up and down in front of a market with sandwich signs reading: "Galler 7-Up  Locked Out Its Drivers for 9 Months  This Store is Handling 7-Up  Help Us Get Our Job Back  Don't Buy 7-Up." The stores were open for business at the time of the picketing. The pickets passed out small handbills in front of the Grand Union Company store on January 22 and the A & P market on January 17. Neither plaintiffs nor intervenor claimed that the conduct of the pickets was disorderly or violent.
At the conclusion of the testimony and after further argument the trial judge orally concluded that defendants were engaging in secondary picketing in violation of the law and that an injunction against such picketing was not interdicted by N.J.S. 2A:15-51 et seq. Thereafter, on January 26, 1953, an interlocutory injunction issued in favor of plaintiffs and the intervenor, restraining defendants:
"(1) from picketing in this dispute, at or near the premises of any of the plaintiffs' customers; and,
(2) from ordering, commanding, directing, assisting or abetting, in any manner whatsoever, any person or persons in any picketing, in this dispute, at or near the premises of any of the plaintiffs' customers * * *."
*146 It is this injunction, restraining only secondary picketing of the premises of the company's customers, which is under appeal.
Two minor matters should be noted. Unlike the situation in most labor cases, the union has no significant role in these proceedings. Local No. 560 was merely a nominal party defendant in the original rescission suit. It has never been restrained. On January 24, 1952, and before this action came into being, the union notified the defendant-distributors that it would not continue to represent them in the dispute.
The second point is, plaintiffs have never conceded that there is an employer-employee relationship in this case, or that a labor dispute exists, but have reserved the right to urge the inapplicability of the Anti-Injunction Act. Proofs are still being taken before the Chancery Division, as directed by the mandate of the Appellate Division, to establish just what the relationship between the parties might be. However, for the purpose of obtaining a restraint against secondary picketing, plaintiffs have proceeded as though an employer-employee relationship and a labor dispute exist.
Defendants contend that the trial court was without jurisdiction to grant the interlocutory injunction, that they were denied procedural due process, and that the findings of fact set out in the order of January 26, 1953 are unsupported in the record. The argument is presented under ten subheads. We perceive no need for discussing the questions thus raised because in our view the central and dispositive issue is whether the trial court could, in the circumstances, enjoin defendants' secondary picketing.
As already noted, this court decided that the relationship between the company and defendants was that of employer and employee and that a labor dispute existed within the purview of the Anti-Injunction Act (22 N.J. Super. 477). This determination is the controlling law of the case, at least until the trial court has completed the taking of proofs pursuant to the mandate of this court and *147 the facts are proved to be otherwise. 21 C.J.S., Courts, § 195, p. 330 et seq.
It may be observed in passing that the injunction here in question, expressly enjoining picketing at or near the premises of any of the company's customers, is identical with paragraph (k) of the May 23, 1952 injunction, set out above, unanimously reversed by the Appellate Division on the previous appeal. We do not concern ourselves with this aspect of the case but proceed to a consideration of the main issue.
Concerted action by workers to enforce requests made of their employer necessarily involves pressure which may cause him financial loss or at least interfere with his freedom to operate his business as he likes. Such action often results in the inflicting of intentional harm and has been regarded as subjecting workers to liability unless their conduct was justified. For more than half a century the law of picketing rested on this foundation of tort principles; the development of the law related to the issue of justification. Tanenhaus, Picketing as a Tort, 14 Pitt. L. Rev. 170 (1953).
The controlling general principle which emerges from the cases is that workers are privileged to act in concert against their employer if the object and means of their concerted action are proper. What has motivated the defendants in this case is a desire to obtain increased compensation for their labor. Under their contract with the company they agreed that it would charge them 60¢ per case of 7-Up which would then be sold to the retailer for 80¢. Their demand is that they pay the company 71¢ a case and, in turn, get 96¢ from the retailer. Under this new schedule, defendants would get a 25¢ return on each case instead of 20¢. Such a demand for an increase in wages of commissions currently paid to employees is the historic and simplest example of a proper object of concerted action. 4 Restatement of the Law of Torts (1939), § 784, pp. 122-123.
The means employed by defendants is likewise proper. The applicable principles are succinctly stated in the Restatement of the Law of Torts, sections 799 and 801. Section 799 deals with situations in which third persons are sought to be *148 persuaded not to deal with the employer during the employees' dispute with him:
"Employees are not liable to their employer for harm caused by inducing third persons through fair persuasion and for a proper object to refrain, during their dispute with the employer, from
(a) patronizing him or buying from any one else goods or services sold, produced or possessed by him, * * *."
As noted in the "Comment" to that section, the enlisting of public support is one of the objects of the primary privilege of informing the public of the existence of a labor dispute; it is but one of the several forms of economic pressure that may be exerted upon the employer. However, such pressure may not exceed the bounds of fair persuasion. Although argument, exhortation and entreaty by pickets or otherwise are proper, violence and disorder are not. There must be no threat of physical harm, no molestation or harassment, or material and fraudulent misrepresentations.
The effort to restrict the employer's consumer market may be extended to all persons who purchase his product. Accordingly, defendants may, within the limits of fair persuasion, induce wholesalers, retailers and the ultimate consumers not to purchase 7-Up. They may do so by advertising, by distributing circulars or by picketing. Defendants here chose to picket, and such pickets may be stationed at the company's plants or at the retail stores or markets where 7-Up is sold, as long as the request not to buy is limited to the company's product. 4 Restatement of the Law of Torts, § 799, Comment (b), pp. 144-145.
Section 801 of the Restatement deals with situations where employees attempt to induce customers and suppliers not to deal with third persons until they in turn refuse to deal with the employer:
"Employees are not liable to their employer or to the third person if, in order to induce the third person to refrain from doing the acts stated in § 799, they induce others, by fair persuasion and for a proper object, to refrain
(a) from buying from the third person goods or services which have been furnished to him by the employer, * * *."
*149 Thus, defendants are privileged to induce customers not to buy 7-Up from a particular retailer during the course of the dispute.
Nothing which defendants did in picketing the markets in question exceeded the bounds of fair persuasion. The picketing was admittedly orderly and peaceful. There were no threats, molestation or harassment. It is not contended that the signs carried by the pickets or exhibited on their trucks were untrue. Customers were not asked to refrain from buying at the picketed retail outlets; rather, they were requested not to buy 7-Up.
We have here a form of secondary picketing known as product picketing  picketing directed against the product itself and not against the person selling it. Peaceful picketing of the place of business of a merchant selling the product of a manufacturer who is a party to a labor dispute, for the purpose of asking the public to refrain from purchasing such product, is permissible. Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940); Bakery & Pastry Drivers, etc. v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178 (1942); Wilson & Co. v. Birl, 27 F. Supp. 915 (D.C.E.D. Pa. 1939), affirmed 105 F.2d 948 (C.C.A. 3 1939); Donnelly Garment Co. v. Dubinsky, 55 F. Supp. 587 (D.C.W.D. Mo. 1944), affirmed 154 F.2d 38 (C.C.A. 8 1946); Fortenbury v. Superior Court, 16 Cal.2d 405, 106 P.2d 411 (Sup. Ct. 1940); Mason and Dixon Lines, Inc. v. Odom, 193 Ga. 471, 18 S.E.2d 841 (Sup. Ct. 1942); Ellingsen v. Milk Wagon Drivers' Union, etc., 377 Ill. 76, 35 N.E.2d 349 (Sup. Ct. 1941); Johnson v. Milk Drivers & Dairy Employees Union, etc., 195 So. 791 (La. App. 1940); Twitchell-Champlin Co. v. Conary, 11 C.C. Lab. Cas. 70, 165 (Me. Super. Ct. 1946); Goldfinger v. Feintuch, 276 N.Y. 281, 11 N.E.2d 910, 16 A.L.R.2d 477 (Ct. App. 1937); People v. Muller, 286 N.Y. 281, 36 N.E.2d 206, 136 A.L.R. 1450 (Ct. App. 1941); Englander Co., Inc. v. Tishler, 280 App. Div. 217, 112 N.Y.S.2d 611 (App. Div. 1952); Alliance Auto Service, Inc., v. Cohen, 341 Pa. 283, *150 19 A.2d 152 (Sup. Ct. 1941); 1 Teller, Labor Disputes and Collective Bargaining (1940), § 123, pp. 374 et seq., 1947 Cum. Supp., pp. 52 et seq., 1950 Supp., pp. 15 et seq.; 29 A.L.R.2d 323, § 25, pp. 374 et seq., § 38, pp. 399 et seq. Many of the states which allow product picketing have an anti-injunction act modeled upon the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101 et seq., and similar to our own law, L. 1941, c. 15 (now N.J.S. 2A:15-51 et seq.), with its broad definition of "labor dispute" (N.J.S. 2A:15-58(c)).
The "unity of interest" which the New York Court of Appeals found to exist between the picketed retailers and the manufacturer in Goldfinger v. Feintuch, above, is present here. As the court observed in that case, where a manufacturer disposes of its product through retailers in unity of interest with it, employees may follow the product to the place where it is sold and peacefully ask the public to refrain from purchasing it; otherwise they would be deprived of a fair and proper means of bringing their plea to the attention of the public. And in Fortenbury v. Superior Court, above, the California Supreme Court said:
"Although the respondent argues that a person secondarily boycotted is an innocent third party caught between the upper and lower millstones of an industrial dispute in which he has no interest, this is clearly not correct. One who sells a product of a merchant or manufacturer who is engaged in a labor dispute with his employees, inescapably becomes an ally of the employer. He has a direct unity of interest with the one being struck. By providing an outlet for that product, he enables the employer to maintain the working conditions against which labor is protesting. And unless the union is allowed to follow the product to the place where it is sold and to ask the public by peaceful representations to refrain from purchasing it, the workers have no real opportunity to tell their story to those whose interest or lack of interest will, in large measure, determine the issues in dispute. Goldfinger v. Feintuch, 276 N.Y. 281, 11 N.E.2d 910, 116 A.L.R. 477.
Obviously, the establishment where a product is sold is the only effective point where the consumer may be told the facts concerning a labor controversy. * * *" 16 Cal.2d at page 413, 106 P.2d 411.
*151 The retail outlets which handle plaintiffs' 7-Up are not neutrals. Though not actual parties to the labor dispute between the company and defendants, they have a definite economic relation to the producer of the soft drink they choose to sell. There is necessarily an interdependence and interrelation between the production, distribution and sale of the product of a business, these being but successive stages in the conduct of the industry. As to who are "neutrals," see Hellerstein, Secondary Boycotts in Labor Disputes, 47 Yale L.J. 341, 354 (1938) and Cushman and Herrick, A Re-examination of Picketing and Free Speech, 34 Cornell L.Q. 81, 86 (1948); and for a short history of "unity of interest" see Barnard and Graham, Labor and the Secondary Boycott, 15 Wash. L. Rev. 137, 155 (1940).
What we have said must be limited strictly to the facts before us. There was no attempt made here to persuade customers not to deal with the stores and markets handling 7-Up. Nor do we have a case of secondary picketing of an ultimate consumer, as contrasted with the intermediate distributor (cf. American Gas Stations, Inc. v. Doe, 250 App. Div. 227, 293 N.Y.S. 1019 (App. Div. 1937)), or a situation where a service is supplied by an allegedly unfair employer to the party sought to be picketed and where, consequently, no product is involved (cf. Spanier Window Cleaning Co. v. Awerkin, 225 App. Div. 735, 232 N.Y.S. 886 (App. Div. 1939)).
Plaintiffs and intervenor rely on Evening Times Printing, etc., Co. v. American Newspaper Guild, 124 N.J. Eq. 71 (E. & A. 1938), affirming 122 N.J. Eq. 545 (Ch. 1937), decided before the enactment of our Anti-Injunction Act, L. 1941, c. 15. In that case defendants demanded a closed-shop contract from complainant publisher. The company refused and defendants then picketed the business premises of those advertising in its newspaper. Chancery enjoined the picketing of any residence, building or other place with the exception of complainant's premises, as well as the picketing of the premises, store or establishment of any merchant, storekeeper or industrial concern.
*152 The Evening Times case is distinguishable. The court there interpreted our former Anti-Injunction Act, L. 1926, c. 207, and held it inapplicable. Justice Case stressed that there was no dispute in the statutory sense between the defendants and those whose property they were enjoined from picketing, noting that New Jersey did not yet have the equivalent of the federal Norris-LaGuardia Act which, by its provisions, gave wider application to the term "labor dispute" than did our statute. Our present Anti-Injunction Act (N.J.S. 2A:15-58(c)) gives a much broader definition of "labor dispute" than did the 1926 act.
A reading of the lower court opinion (122 N.J. Eq. 545, 547, 548) reveals that the Evening Times case, unlike this one, involved personal threats to the advertisers, as well as signs and statements from the picket line which sought to persuade the public from patronizing their businesses. Another and fundamental distinguishing feature is that the Evening Times case did not involve product picketing, as here. Those picketed did not sell the newspaper published by complainant, and there was no picketing against the purchase of the paper.
Three years after the Evening Times decision the Court of Errors and Appeals decided Kingston Trap Rock Co. v. International Union, etc., 129 N.J. Eq. 570 (1941), a "hot cargo" case. It noted that the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101 et seq., prototype of our Anti-Injunction Act of 1941 (N.J.S. 2A:15-51 et seq.), had drastically curtailed the equity jurisdiction of the federal courts in the sphere of labor controversies. The federal act, like ours, provided that a person would be held to be a participant or interested in a labor dispute if engaged in the industry, trade, craft or occupation in which the dispute occurred, or if he had a direct or indirect interest therein. 29 U.S.C.A. 113(a); N.J.S. 2A:15-58(b). The court recognized that the design of the Norris-LaGuardia Act was to correct the granting of objectionable injunctions based on a "misinterpretation" of existing laws, in such cases as Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. *153 349 (1921). (See Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940), where it was pointed out that the Norris-LaGuardia Act had been passed because it was felt that the jurisdictional limitations of the Clayton Act had largely been nullified by judicial decisions of the kind found in the Duplex Printing case, American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921), and Bedford Cut Stone Co. v. Journeymen Stone Cutter's Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927)). It is significant that the Court of Errors and Appeals had relied on the Duplex Printing case in the Evening Times decision (124 N.J. Eq. 71, 81) and in Van Buskirk v. Sign Painters Local No. 1231, 127 N.J. Eq. 533, 534 (1940).
Justice Heher, who wrote the opinion of the unanimous court which set aside the restraint granted in the Kingston Trap Rock case, quoted Goldfinger v. Feintuch, 276 N.Y. 281, 11 N.E.2d 910, 116 A.L.R. 477 (Ct. App. 1937), with approval:
"And there is authority for the proposition that peaceful `picketing may be carried on not only against the manufacturer but against a nonunion product sold by one in unity of interest with the manufacturer who is in the same business for profit;' and this for the reason that, `where a manufacturer pays less than union wages, both it and the retailer who sells its products are in a position to undersell competitors who pay the higher scale, and this may result in unfair reduction of the wages of union members. * * * Where the manufacturer disposes of the product through retailers in unity of interest with it, unless the union may follow the product to the place where it is sold and peacefully ask the public to refrain from purchasing it, the union would be deprived of a fair and proper means of bringing its plea to the attention of the public.'" (129 N.J. Eq., at pages 582-583)
The Kingston Trap Rock case was argued some time prior to the introduction and passage of the Anti-Injunction Act of 1941. That law came before the former Court of Chancery in a case involving secondary picketing two weeks after it had been enacted. In Newark Milk and Cream Co. v. Milk *154 Drivers, etc., 19 N.J. Misc. 468 (Ch. 1941), defendant picketed complainant's retail outlets because it had not signed up with the union. The picket banners asked the public to buy only milk and cream delivered by A.F. of L. drivers. The picketing was peaceful. The vice-chancellor quoted extensively from the new act and refused injunctive relief. The Newark Milk case was cited in passing, and apparently with approval, in Isolantite, Inc. v. United Electrical, etc., Workers of America, 132 N.J. Eq. 613, 619 (E. & A. 1942), modifying 130 N.J. Eq. 506 (Ch. 1941).
Our present Supreme Court, in Outdoor Sports Corp. v. A.F. of L., Local 23132, 6 N.J. 217, 228 (1951), referred by way of dictum to the holding of the Kingston Trap Rock case  that peaceful voluntary secondary picketing where there is a unity of interest among the persons involved is lawful. Plaintiffs refer to the Outdoor Sports case to support their contention that the trial court properly granted the restraint which is the subject of this appeal. That case is clearly distinguishable: it stands simply for the proposition that the Anti-Injunction Act (N.J.S. 2A:15-51 et seq.) "is not applicable in the absence of an employer-employee relationship and a labor dispute either directly or proximately related thereto" (6 N.J., at p. 228). Such is not the situation here. 22 N.J. Super. 477.
Defendants argue that the restraint imposed against secondary picketing violates their constitutional right of free speech under Article I, paragraph 6 of the State Constitution and the Fourteenth Amendment to the Federal Constitution. The injunction, they contend, emasculates their statutory right of
"Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, picketing, without fraud or violence, or by any other method involving fraud or violence, and not in violation of any other law of the State of New Jersey." (N.J.S. 2A:15-51(e)
They consider that Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), and Carlson *155 v. People of State of California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104 (1940), projected a broad construction of the right of free speech as applied to picketing. There is a suggestion in this argument of a concept which beguiled many courts in the early 1940's  the identification of the right to picket with the constitutional guarantee of free speech. However, a close reading of the Thornhill and Carlson cases against the background of their particular facts, and of Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229 (1937) which preceded them, fails to sustain the conclusion so often loosely drawn in the past that the Supreme Court had equated picketing with free speech. Later decisions do not support that proposition; they reveal a more circumscribed and probing treatment of an increasingly complex and troublesome problem. Evident throughout any careful study of the cases is the fact that free speech does not preclude limitations on the use and conduct of the picket line. Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941); Carpenter & Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143 (1942); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949); Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); International Brotherhood of Teamsters, etc. v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995 (1950), rehearing denied 339 U.S. 991, 70 S.Ct. 1019, 94 L.Ed. 1391 (1950). Building Service Employees Int'l. Union, etc., v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045 (1950), rehearing denied 339 U.S. 991, 70 S.Ct. 1019, 94 L.Ed. 1391 (1950). And see Tanenhaus, Picketing-Free Speech: The Growth of the New Law of Picketing from 1940 to 1952, 38 Cornell L.Q. 1 (1952); 1 Teller, Labor Disputes and Collective Bargaining (Cum. Supp. 1947), pp. 70-98.
The Supreme Court has recognized that picketing involves not only the exercise of free speech but something more. Building Service Employees Int'l. Union, etc., v. Gazzam, 339 U.S. 532, 537, 70 S.Ct. 784, 94 L.Ed. 1045, 1050 *156 (1950). Determination of specific cases has called for a delicate balancing of tort doctrine which regards picketing as illegal unless justified, and free speech doctrine which considers restraints upon picketing unconstitutional unless justified. The burden of proof apparently still rests, as it has since Thornhill v. State of Alabama, upon those who seek to limit picketing.
The court itself has observed that the line between permissible and unlawful picketing will often be narrow or even tenuous. Local Union No. 10, etc., v. Graham, 97 L.Ed. 542, 548 (March 1953). The point at which it has arrived in the course of defining the law on picketing and free speech is indicated by International Brotherhood of Teamsters, etc., v. Hanke, 339 U.S. 470, 474-475, 70 S.Ct. 773, 94 L.Ed. 995, 1001-1002 (1950), where Justice Frankfurter said:
"Here, as in Hughes v. Superior Court, 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985], * * * we must start with the fact that while picketing has an ingredient of communication it cannot dogmatically be equated with the constitutionally protected freedom of speech. Our decisions reflect recognition that picketing is `indeed a hybrid.' Freund, On Understanding the Supreme Court 18 (1949). See also Jaffe, In Defense of the Supreme Court's Picketing Doctrine, 41 Mich. L. Rev. 1037 (1943). The effort in the cases has been to strike a balance between the constitutional protection of the element of communication in picketing and `the power of the State to set the limits of permissible contest open to industrial combatants.' Thornhill v. [State of] Alabama, 310 U.S. 88, 104, 60 S.Ct. 736, 84 L.Ed. 1093, 1103. A State's judgment on striking such a balance is of course subject to the limitations of the Fourteenth Amendment. Embracing as such a judgment does, however, a State's social and economic policies, which in turn depend on knowledge and appraisal of local social and economic factors, such judgment on these matters comes to this Court bearing a weighty title of respect."
Thus, the Supreme Court has not hesitated to uphold a ban on picketing undertaken in support of unlawful objectives (Giboney v. Empire Storage and Ice Co., Building Service Employees Int'l. Union v. Gazzam, Hughes v. Superior Court, Local Union No. 10, etc., v. Graham, above), but such objectives, to be unlawful, must involve substantive evils. (Cf. Simon v. Journeymen Barbers, etc., 11 N.J. 448 *157 (1953)). And, as just noted, the court has held that picketing may be enjoined if its conduct is inconsonant with the best interests of the community (International Brotherhood of Teamsters, etc., v. Hanke, above).
We hold that defendants' peaceful picketing of the company's retail outlets was not carried on in support of an unlawful objective, nor was it contrary to community interest. Their activity was within "the limits of permissible contest open to industrial combatants." The restraint granted by the trial court therefore runs contrary to the quoted provisions of N.J.S. 2A:15-51(e) permitting defendants to publicize the labor dispute in which they are involved, and violates their constitutional right of free speech. Cf. Bakery & Pastry Drivers, etc., v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178 (1942).
The Chancery Division order of January 26, 1953 is accordingly reversed.