NICHOLAS JONES & others *vs.* DEMOULAS
SUPER MARKETS, INC.

NICHOLAS JONES & others *vs.* DSM REALTY, INC. & others.

Suffolk.     November 8, 1973. — March 7, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY,
& KAPLAN, JJ.

*Labor and Labor Union. Unlawful Interference. Boycott. Equity Pleading and Practice,* Injunction, Labor case, Parties. *Jurisdiction,* Labor, Raising question of jurisdiction. *Equity Jurisdiction,* Labor dispute. *Statute,* Construction. *Words,* "Secondary boycott," "Labor dispute," "Industry."

Where a farm workers union in 1973 engaged in picketing and related activities at supermarkets occasioned by refusal of the proprietor of the supermarkets to comply with a demand by the union that the supermarkets cease trading in lettuce and grapes produced in California by firms employing agricultural workers not members of the union, and the proprietor sought to have such activities of the union at the supermarkets enjoined, it was held that there was a "case involving or growing out of a labor dispute" as defined in G. L. c. 149, § 20C, and that a preliminary injunction issued against the union by one judge of the Superior Court without hearing testimony and without making any findings was issued without jurisdiction and must be annulled by reason of noncompliance with the procedural requirements of c. 214, § 9A, and the requirement of a three judge court in c. 212, § 30. [730-739] BRAUCHER, J., concurring. TAURO, C.J., dissenting on the grounds that the jurisdictional issue was not yet ripe for review and that there was no "labor dispute." [744-758]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on August 16, 1973, for annulment or modification of interlocutory injunctions entered in the Superior Court in two suits in equity.

Upon transfer to the Appeals Court, the case was heard by *Armstrong,* J.

Jones *v.* Demoulas Super Markets, Inc.

*Robert H. Goldman (James T. Curtis, Cornelia C. Adams & Franklin L. Bridges, III,* with him) for the defendants.

*Alan Rader (Alfred H. Sigman* of California *& Nathan S. Paven* with him) for the plaintiffs.

KAPLAN, J.    The main question to be answered is whether interlocutory decrees granting preliminary injunctions against a labor union and its sympathizers were or were not invalid for failure to comply with the procedural requirements of our labor statutes, notably our statute deriving from the familiar Federal Norris-LaGuardia Act.

Two verified bills of complaint were filed in the Superior Court, Middlesex County, one bill by Demoulas Super Markets, Inc., which leases and operates thirteen retail food supermarkets in the northeasterly part of the State, the other bill by DSM Realty, Inc., and an individual, Demoulas, as trustee of certain realty trusts, owners of the shopping centers in which ten of the supermarkets are located. Both bills named as defendants three individuals as representatives of a class consisting of officers, members, and adherents of the United Farm Workers Union, AFL-CIO (UFW).

These supermarkets sell at retail fresh lettuce and grapes; the items are two among thousands of items sold, and constitute but a very small part of total sales. The "head" or "iceberg" lettuce and table grapes offered for sale are grown or produced in California by firms employing agricultural workers who are either nonunion or are members of a union rival of UFW. UFW has struck these employers in a long-continued effort to unionize them and to cause them to deal and contract with UFW as bargaining representative of the workers.[1]

The gravamen of the bills of complaint is that UFW has engaged in picketing the supermarkets and distributing handbills there with the object of inducing customers and pro-

---

[1] It may be noted that agricultural workers are not covered by the Labor Management Relations Act, 1947, as amended (subch. II, National Labor Relations) 29 U.S.C. § 152 (3) (1970).

*In these opinions, the respective terms "plaintiff" or "plaintiffs" and "defendants" refer to the parties in the Superior Court litigation. REPORTER.

spective customers to stop patronizing these stores[2] because
they trade in the lettuce and grapes produced by firms
employing non-UFW field hands and refusing to recognize
or bargain with UFW. Picketing and distribution of hand-
bills allegedly have taken place within the shopping centers
at the entrances to the supermarkets and in the parking areas
which surround the stores. The bills complain of harassment
of customers and of roaming and littering of the parking
areas which may increase driving hazards (there is no charge,
however, of outright violence by UFW). The bills complain
also of alleged fraud in misstatements contained in UFW's
propaganda, such as that the supermarkets are "scab" or
"nonunion." In particular instances, managers of the super-
markets have called on the police to arrest picketers or
handbill distributors for trespass on private property, but no
arrests have been made either because the police have failed
to respond or, perhaps, because the demonstrators have
moved off the grounds and onto public ways when the police
arrived.

There is reference in the bills to a meeting in June, 1973,
between representatives of the plaintiffs and of UFW in
which UFW stated its demand that the supermarkets cease to
trade in the non-UFW produce. In refusing to accede and
declaring their intention to continue to buy from growers
and wholesalers with whom they had previously dealt, the
supermarkets said that they were prepared to buy UFW pro-
duce so far as available to them, but were unwilling to
undertake to confine themselves to that produce exclusively.
In this connection, the supermarkets point out, particularly
with regard to lettuce, that certain of their competitors who
earlier acceded to UFW's demands were in effect largely
preëmpting the UFW produce coming into the local areas, so
that the plaintiff supermarkets could at best cover only a
fraction of their needs if they limited themselves to UFW
produce. UFW has not accepted this explanation. Picketing
began on a considerable scale later in June. It is alleged that
the supermarket managers have proposed that UFW comply

---

[2]As to the precise content of the appeals to customers, see p. 741 below.

with rules and regulations for demonstrations at the shopping centers acceptable to the owners and lessees, but UFW has refused.

The bills state that the true dispute is between UFW and the California growers and producers, and characterize UFW's activities at the supermarket locations as constituting an illegal secondary boycott. Alleging that the picketing has discouraged customers and caused a decline of sales — losses of business which bear also on the plaintiff realty owners because rents are related to the earnings of the supermarkets — and alleging further that they had no adequate remedy at law, the plaintiffs demanded temporary restraining orders, preliminary injunctions, and final decrees to halt UFW's picketing and handbill distribution and other conduct at the supermarkets; the plaintiffs also demanded damages.

On the verified bills, filed on July 20, 1973, counsel on both sides were heard on July 24, 1973.[3] The plaintiffs did not file any affidavits in support of the bills, nor were any filed in opposition, nor were any witnesses called. On August 1, 1973, the judge, without making any findings, entered a preliminary injunction in each case which effectively prohibits all picketing and similar activities by UFW within the shopping centers.[4] The defendants filed claims of appeal and applied by verified petition to a single justice of this court pursuant to G. L. c. 214, § 22, for annulment or modification of the injunctions pending appeal. Under G. L. c. 211, § 4A, and Appeals Court Rule 2:01, 1 Mass. App. Ct.      , the single justice transferred the cause to the Appeals Court

---

[3] The defendants' petition for annulment or modification of the preliminary injunctions, referred to below, states that the defendants' attorneys were notified by telephone on July 20 that the plaintiffs would be heard on July 24 on their request for temporary restraining orders; that they received copies of the bills of complaint by mail on July 23, and the plaintiffs' memorandum of law in court on July 24.

[4] The preliminary injunctions are identical and command the defendants, individually and as representatives, "to desist and refrain from picketing, marching, demonstrating, harassing or intimidating customers or prospective customers of the Demoulas Super Markets, while on the property owned or leased by the plaintiffs, including the parking lots adjacent to said stores, if owned or leased by the plaintiffs, until the further order of our said Court, or some Justice thereof."

Apparently the defendants, while denying that acts of harassment or intimidation or the like have occurred, would not object to an injunction limited to such acts.

where it was heard by a single justice of that court. In an order dated September 14, 1973, accompanied by an opinion, that single justice annulled the preliminary injunctions, holding that the judge of the Superior Court was without jurisdiction to grant them. The single justice also commented in his opinion on the substantial merits of the cases as they appeared from the bills and the petition to annul or modify the preliminary injunctions. From the order of annulment the defendants took their appeal to the bench of the Appeals Court. The appeal is before this court on certificate of all the justices of the Appeals Court pursuant to G. L. c. 211A, § 10, that such direct review is in the public interest. As the order of annulment entered by the single justice of the Appeals Court was stayed by him pending final determination of the appeal therefrom, the preliminary injunctions have remained in effect.

General Laws c. 214, § 9A (1), provides, in part, that "No court shall have jurisdiction to issue a preliminary or permanent injunction in any case involving or growing out of a labor dispute" as defined in c. 149, § 20C, unless certain procedural safeguards are afforded and unlawful acts are found to have been committed or threatened; § 20C, besides defining the terms, indicates what is a lawful and unlawful labor dispute and an unlawful secondary boycott.

There is agreement that if the present cases[5] were within § 9A (1), then the judge of the Superior Court was without "jurisdiction" to enter the injunctions,[6] since the stated pro-

---

[5]There was no reason here to consider the case of the plaintiff realty owners separately from that of the plaintiff supermarkets. Even if the apparent close relation among them is disregarded, the withdrawal of "jurisdiction" by § 9A (1) extends to all. "Jurisdiction to issue any such injunction is, in so many words, denied to the courts. It makes no difference who is the plaintiff. There is no jurisdiction to issue such an injunction on anyone's application. Such are the plain words of the statute, and the obvious intent makes it even plainer." *Schivera* v. *Long Island Lighting Co.* 296 N. Y. 26, 31 (1946). Cf. *Mengel* v. *Superior Court,* 313 Mass. 238, 242-243 (1943); *Milk Wagon Drivers' Union, Local No. 753* v. *Lake Valley Farm Prod. Inc.* 311 U. S. 91, 100-103 (1940); *Brotherhood of R.R. Trainmen* v. *Atlantic Coast Line R.R.* 362 F. 2d 649, 655 (5th Cir. 1966); *Lee Way Motor Freight, Inc.* v. *Keystone Freight Lines, Inc.* 126 F. 2d 931, 934 (10th Cir. 1942).

[6]And it was right for the single justice below to notice the defect sua sponte, as it would go to the jurisdiction of the court in a fundamental sense. (The defendants in their petition for annulment mentioned a number of respects in which the procedures of the Superior Court in these cases failed in fact to comply with the statute, but they did not specifically rely on the statutory infractions as depriving the court

cedural prerequisites were not fulfilled. The requirements in question are intended to deter a court from "shooting from the hip" and to encourage it to be deliberate and conservative in granting injunctive relief. The reason for the categorical legislative denial to the courts of jurisdiction to issue injunctions in labor dispute cases unless prescribed procedures are followed, is too much a matter of well ploughed history to be set forth here, see Frankfurter and Greene, The Labor Injunction (1930), and we have only to observe that a number of the procedural safeguards called for by statute hark back to the traditionally cautious equity practice. With some special provisions for situations where temporary restraining orders are sought, an injunction can be granted only after hearing the testimony of witnesses in open court in support of a verified petition, with opportunity for cross-examination, and only on findings of fact by the court that unlawful acts are threatened or have been committed and will be committed or continued unless restrained; that substantial and irreparable injury to the plaintiff's property will follow; and that, as to each item of relief granted, greater injury will be inflicted on the plaintiff by denying relief than will be inflicted on the defendant by granting it. G. L. c. 214, § 9A (1) (b) and (c).[7] Moreover, a single judge cannot act; rather it is provided by legislation of 1959 that a three-judge court must be convened. G. L. c. 212, § 30.

In our opinion the present cases fall within the statutory definitions attracting all the procedural restrictions described above, and the order of annulment was therefore correct. Reverting to the words "case involving or growing out of a labor dispute,"[8] we seek the meaning of "labor dispute" in

of jurisdiction.) In the case of *Brockton Pub. Mkts. Inc.* v. *Jones, post,* 759, decided this day, the defendants raised the jurisdictional question promptly by means of a motion for the appointment of three judges in accordance with G. L. c. 212, § 30.

[7]See the further procedural requirements at § 9A (1) (d) and (e), (2) through (6), which include provisions for a finding as to police protection, for filing undertakings, and for a showing by a complainant who seeks an injunction that he has made reasonable efforts to settle the dispute.

[8]Section 9A (1) states in part: "No court shall have jurisdiction to issue a preliminary or permanent injunction in any case involving or growing out of a labor dispute, as defined in section twenty C of chapter one hundred and forty-nine, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath,

§ 20C (c), where it is defined to "[include] any controversy arising out of any demand of any character whatsoever concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating . . . or seeking to arrange, terms or conditions of employment, regardless of whether the disputants stand in proximate relation of employer and employee." In the present cases we find a controversy between disputants — the plaintiffs and the defendants — who do not, to be sure, stand in a relation of employer-employee; the controversy arises out of demands made by the defendants, as representatives of agricultural employees, upon the growers and producers, as employers or prospective employers, regarding the association or representation of these employees in seeking to negotiate terms of employment. The "regardless" clause takes in situations of primary dispute between a union and an employer although no union members are being employed; for example, a situation in which a union pickets an employer to unionize the shop although it has no members there, as in *Poirier* v. *Superior Court,* 337 Mass. 522 (1958); cf. *New Negro Alliance* v. *Sanitary Grocery Co.* 303 U. S. 552 (1938). So also the "regardless" clause covers situations where a union, party to a primary employer-employee dispute, applies pressure to another person, thereby engaging in a secondary controversy with him, in hopes that he will so act in his business as to exert pressure on the adversary in the primary dispute; such in outline is the present situation of secondary boycott.[9] Cf. *New York, N. H. & H. R.R.* v. *Jenkins,* 331 Mass. 720 (1954), revd. on other grounds sub nom. *Local Union No. 25 of the Intl. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America* v. *New York, N. H. & H. R.R.* 350 U. S. 155 (1956); *Milk Wagon Drivers' Union, Local No. 753* v. *Lake Valley Farm Prod. Inc.* 311 U. S. 91 (1940); *Goldfinger* v. *Feintuch,* 276 N. Y. 281 (1937). The Rhode Island Supreme Court, correctly, as it seems to us, applied a definition like our § 20C (c), with the

and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect . . .."

[9]Exact definitional precision can be forgone here; see n.21, *infra.*

"regardless" clause, to a boycott of a local supermarket by UFW sympathizers similar in causes and circumstances to the one at bar. *Almac's Inc.* v. *R. I. Grape Boycott Comm.* 110 R. I. 36 (1972). As the opinion below supporting the order of annulment observes, the proposition that such secondary relations are within § 20C (c) is reinforced by the fact that § 20C (f), describing an "unlawful secondary boycott," speaks of it as "arising out of a labor dispute."

But if we have here a "labor dispute," as defined, we need to go a short step further to determine whether the present "cases" (i.e., suits) "involve" or "grow out of" that dispute. A factual connection is called for, but it need not be a tight one. Section 20C (a) says, as a first alternative, that a case shall be held to "involve" or "grow out of" the dispute when it "involves persons who are engaged in the same industry, trade, craft or occupation," and this seems to us satisfied here by the fact that UFW is engaged in the food industry as are the plaintiff supermarkets; the industry can be taken to include those who grow, harvest, pack, and sell at wholesale and retail. See *Milk Wagon Drivers' Union, Local No. 753* v. *Lake Valley Farm Prod. Inc., supra,* 311 U. S. at 93-94 (1940) (production, processing, sale, and distribution of milk regarded as one industry, trade, and so forth); *Bakery Sales Drivers Local Union No. 33* v. *Wagshal,* 333 U. S. 437, 444 (1948); *Marine Cooks & Stewards, AFL* v. *Panama S.S. Co. Ltd.* 362 U. S. 365, 367-368, 370 (1960); *Donnelly Garment Co.* v. *Dubinsky,* 154 F. 2d 38, 40-41 (8th Cir. 1946); *Galler* v. *Slurzberg,* 27 N. J. Super. 139, 150-151 (1953), cert. den. 13 N. J. 391 (1953); *Goldfinger* v. *Feintuch, supra,* 276 N. Y. at 286-287 (1937); *Alliance Auto Serv. Inc.* v. *Cohen,* 341 Mass. 283, 287 (1941). We need not try to define the outer limits of the functional concept of "industry" contained in the labor statute. It is enough to say that to remove the plaintiff supermarkets, selling food at retail, from the food industry in common with UFW on the ground that they sell many sorts of food (or other things besides) would give them an immunity from the statute which in these days of multiproduct stores could not be

defended in reason, policy, or authority.

But our statute contains further terms more expansive than "industry," for § 20C (a) states, as another alternative, that a case "involves" or "grows out of" a labor dispute when it "involves any conflicting or competing interests" in the dispute of " 'persons participating or interested' therein," the latter words being in turn defined thus (§ 20C [b]): "A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft or occupation in which such dispute occurs, or has a direct or indirect interest therein." The requirement of "conflicting or competing interests" is satisfied,[10] and the other words of § 20C (b), especially the word "indirect," are broad.[11] We should add that, like Federal courts interpreting the Norris-LaGuardia Act, this court is committed to reading our statutes sympathetically, see *DiLeo* v. *Daneault,* 329 Mass. 590, 597 (1953); so in a case of doubt the party should be held entitled to the procedural protections. This court, indeed, is adjured to adopt this attitude by § 7 of St. 1950, c. 452, an important amendatory enactment:[12] "[T]his act [c. 452] shall be construed liberally in aid of its purpose which is to limit and curtail the use of injunctions in labor disputes."

Lifting our eyes from the precise words of the statutes, we are obliged to consider that it was a principal aim of the Norris-LaGuardia Act to extend the procedural protections to cases of secondary boycotts in a labor struggle. In 1921, in

---

[10]Compare the discussion, pp. 737-738 below, concerning a "self-interest test."

[11]With regard to the defendants (UFW) as persons "participating or interested": "relief" is sought against them in these suits, and, especially when "indirect" is taken into account, they satisfy the rest of the sentence whether the referent of "therein" be "industry" or "dispute." See *New Negro Alliance* v. *Sanitary Grocery Co.* 303 U. S. 552, 559-560 (1938); *Fur Wkrs. Union, Local No. 72* v. *Fur Wkrs. Union No. 21238,* 105 F. 2d 1, 6-8 (D. C. Cir. 1939). If the plaintiff supermarkets must also fit the sentence, they readily do, the "relief" referred to being the action which the defendants demand and the plaintiffs are in a position to take and which will in fact assist the defendants in their unionizing effort.

[12]It was this statute which added the "regardless" clause to the definition of labor dispute and added definitions of lawful and unlawful labor disputes and unlawful secondary boycotts. (Section 7 of the statute, quoted in the text, is not reproduced in the General Laws.)

the case of *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, which drew the remarkable dissent of Justice Brandeis (Holmes and Clarke, JJ., concurring), it had been held that the Clayton Act did not legalize such a secondary boycott; the boycott could still be held to be an unlawful combination in restraint of trade under the Sherman Act. See also *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn. of No. America,* 274 U. S. 37 (1927). As the Supreme Court later said, "In those cases [the *Duplex* and *Bedford* cases] labor unions had engaged in a secondary boycott; they had boycotted dealers, by whom the union members were not employed, because those dealers insisted on selling goods produced by the employers with whom the unions had an existing controversy over terms and conditions of employment. This Court held that the Clayton Act exempted labor union activities only insofar as those activities were directed against the employees' immediate employers and that controversies over the sale of goods by other dealers did not constitute 'labor disputes' within the meaning of the Clayton Act." *Allen Bradley Co.* v. *Local Union No. 3, Intl. Bhd. of Elec. Wkrs.* 325 U. S. 797, 805 (1945). The unions went to Congress to undo the *Duplex* and *Bedford* cases, and part of the response was the inclusion of the "regardless" clause in the definition of "labor dispute" appearing in the Norris-LaGuardia Act (now 29 U. S. C. § 113 [c]). Secondary boycotts were neither legalized nor proscribed by that act;[13] rather the Federal courts were restricted in their jurisdiction to issue injunctions in labor disputes and these disputes often comprehended such boycotts. So evident was it to Justice Frankfurter that the Norris-LaGuardia Act covered these boycotts that he could say shortly in *Bakery Sales Drivers Local Union No. 33* v. *Wagshal,* 333 U. S. 437, 444 (1948), "Sale by a merchant of non-union commodities is, no doubt,

---

[13]That subject matter was dealt with in the Labor Management Relations Act, 1947, and again in the Labor-Management Reporting and Disclosure Act of 1959, and now appears as 29 U. S. C. § 158 (b) (4), quoted in part at n. 18, *infra.* Our legislation on this matter came in with St. 1950, c. 452, § 2; see n. 12, *supra,* and now appears as c. 149, § 20C (f).

a traditional source of labor disputes within the scope of the Norris-LaGuardia Act.'' Another experienced judge said recently that the history was so clear that "we are not surprised to find a paucity of decisions dealing directly with the question of whether so-called 'secondary boycott' activity of employees and unions may be within the protection of Norris-LaGuardia. Like Justice Frankfurter, reputedly the author of the Act, we would have assumed that the jurisdictional limitations of Norris-LaGuardia apply to secondary boycotts . . .'' Tuttle, C.J., in *Brotherhood of R.R. Trainmen* v. *Atlantic Coast Line R.R.* 362 F. 2d 649, 653 (5th Cir. 1966), affd. by an equally divided court, 385 U. S. 20 (1966). In fact Federal authority on the point has not been lacking. See *Milk Wagon Drivers' Union, Local No. 753* v. *Lake Valley Farm Prod. Inc.* 311 U. S. 91 (1940); *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees of America* v. *Dixie Motor Coach Corp.* 170 F. 2d 902, 905-906 (8th Cir. 1948), and cases cited. A well known example of a like ruling by a State court, applying a local statute, adapted from the Norris-LaGuardia Act, to a secondary boycott, is *Goldfinger* v. *Feintuch,* 276 N. Y. 281 (1937). There a union of meat workers, seeking to unionize an employer-manufacturer, picketed a store that had purchased the product from that manufacturer and was selling it at retail; in a suit by the retailer against the union for injunctive relief, the New York court held that the statute applied, and its procedural incidents attached. See also *Galler* v. *Slurzberg, supra,* 27 N. J. Super. at 149-150 (1953), and cases and authorities cited.

This court has not, perhaps, had occasion to rule squarely that the limitations imposed by our statutes apply to cases of secondary boycotts, but the least that can be said is that we have been receptive to and inclined toward the idea. Thus in *New York, N. H. & H. R.R.* v. *Jenkins,* 331 Mass. 720 (1954), revd. on other grounds sub nom. *Local Union No. 25 of the Intl. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America* v. *New York, N. H. & H. R.R.* 350 U. S. 155 (1956), the defendant union whose members were

employed by motor carriers put pressure on the plaintiff railroad to cease carrying trailers "piggyback" and thereby reducing the amount of work available to the union members. The judge below evidently thought there was no "labor dispute" and he was not required to provide the statutory procedures; but in affirming (with a modification) the final decree — which was for the plaintiff railroad — this court pointed out that the judge had found an unlawful secondary boycott and had in fact sufficiently complied with the statutory requirements. Cf. *Davis Bros. Fisheries Co. Inc.* v. *Pimentel,* 322 Mass. 499 (1948). In *Poirier* v. *Superior Court,* 337 Mass. 522 (1958), this court showed keen awareness of the significance of the "regardless" clause and also noted that adjudged interpretations of the Federal statute should carry over to a later enactment of like language by our Legislature.

The plaintiffs suggest that there is a kind of natural limitation on the reach of the statute securing procedural safeguards, namely, that the quarrel between the disputants should pass an " 'economic self-interest' test," should be shown to be related to the "fairly direct economic interests" of the disputants, and should not have the appearance of being merely a phase of "an all-out class war."[14] If we should momentarily assume such a gloss on the statute, we would find it hard to see why the present case, like others involving boycotts of nonunion goods, does not meet the "test." The economic self-interest that actuates UFW in attempting the boycott is plain. And — if one should accept provisionally UFW's side of the story — the self-interest of the supermarkets is involved because the produce tended and harvested by nonunion workers under deplorable conditions or by workers spuriously unionized and suffering from "sweetheart" contracts will in the end cost retailers less than pro-

---

[14]The words are quoted from *Brotherhood of R.R. Trainmen* v. *Atlantic Coast Line R.R.* (cited earlier in the text of this opinion), from which the plaintiffs derive their suggestion. See 362 F. 2d at 654 and n. 6. The discussion in that case buttressed a holding by the judge that a secondary boycott did fall within the Norris-LaGuardia Act.

duce grown and brought in under sound union conditions; thus retailers willing to traffic in the suspect goods secure a competitive advantage. See *Goldfinger* v. *Feintuch, supra,* 276 N. Y. at 286 (1937); *Fortenbury* v. *Superior Court of Los Angeles County,* 16 Cal. 2d 405, 409-410 (1940).[15] For purposes of such a "test" we are entitled to consider the dynamic forces at work in boycotts of this kind, without delving into the exact motives of self-interest of these particular plaintiffs.

The plaintiffs insist that the present boycott must ultimately be held unlawful under § 20C (f).[16] But it is well established that such a forecast of illegality, no matter how confidently it can be made, is not a reason to deny at the threshold the procedures specified by the statute. As was said in *Poirier* v. *Superior Court, supra,* 337 Mass. at 527 (1958), "The effect of the definitions . . . is to make the procedural safeguards . . . applicable to every kind of labor dispute regardless of whether the dispute is lawful or unlawful as a matter of substantive law."[17] The same point has appeared repeatedly. See *Simon* v. *Schwachman,* 301 Mass. 573, 578-

---

[15]The court remarked in the *Fortenbury* case (at 409): "One who sells a product of a merchant or manufacturer engaged in a labor dispute with his employees, inescapably becomes an ally of the employer. He has a direct unity of interest with the one against whom labor's complaint is directed. By providing an outlet for that product, he enables the employer to maintain the working conditions against which labor is protesting. And unless the union is allowed to follow the product to the place where it is sold and to ask the public by peaceful representations to refrain from purchasing it, the workers have no real opportunity to tell their story to those whose interest or lack of interest will, in large measure, determine the issues in dispute."

[16]Note the clause about "greater part" in the text of § 20C (f): "The term 'unlawful secondary boycott' means any strike, slowdown, boycott, or concerted cessation of work or withholding of patronage or services, arising out of a labor dispute, where an object thereof is to force or require any person not otherwise engaged in such labor dispute to cease using, selling, handling, transporting, or dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; provided, however, that a secondary boycott may lawfully be directed at a person the greater part of whose current business over a representative period is processing, selling, handling, transporting or otherwise dealing in the goods of an employer primarily interested in a lawful labor dispute or who, by any agreement, understanding or arrangement with such employer, is requiring his own employees to perform work or services which would be done by the employees of such employer in the absence of a labor dispute."

[17]In this passage the court cited § 20C (c), (d) and (e) (the latter two subsections define lawful and unlawful labor disputes) but did not cite (f) (which defines an unlawful secondary boycott). The plaintiffs suggest that the omission is significant, but such a distinction would be very thin, and could hardly be justified rationally. In

583 (1938); *Fashioncraft, Inc.* v. *Halpern,* 313 Mass. 385, 389-390 (1943); *Colonial Press, Inc.* v. *Ellis,* 321 Mass. 495, 499-500 (1947); *DiLeo* v. *Daneault, supra,* 329 Mass. at 597 (1953); *Seekonk Family Drive-in Theatre, Inc.* v. *Madino,* 340 Mass. 425, 427-429 (1960). As Judge Edgerton once put it, "The court's ruling [i.e., the ruling there under review] comes to this, that the [Norris-LaGuardia] Act has no application to labor activity which a court thinks illegal or improper. But the Act has no practical application to anything else, for courts have never enjoined labor activity which they thought legal and proper. Therefore the court's ruling not only conflicts with the Act but nullifies it." *Bakery Sales Drivers Local Union No. 33* v. *Wagshal,* 161 F. 2d 380, 385 (D. C. Cir. 1947) (dissenting opinion), affd. 333 U. S. 437 (1948).

Thus the failure to summon a three-judge court under G. L. c. 212, § 30, which would provide a hearing, make findings of fact, and otherwise insure adjective rights cannot be excused by any likelihood that the defendants would lose on the merits in the long run. It happens, however, that the case for the plaintiffs on the merits is not open-and-shut but is rather beset by doubts which can hardly be resolved without an examination and appraisal of the facts. We venture no opinion on the merits and merely recount the problems.

First. The Supreme Court in *National Labor Relations Bd.* v. *Fruit & Vegetable Packers & Warehousemen, Local 760,* 377 U. S. 58 (1964), had before it the problem of interpreting a provision of the Labor Management Relations Act, 29 U. S. C. § 158 (b)(4)(ii)(B), declaring certain secondary boycotts to be an unfair labor practice. A union had struck packers and warehousemen handling Washington State apples in order to secure better terms upon renewal of a collective bargaining agreement with them. To put pressure on

---

fact, G. L. c 212, § 30, requires appointment of three judges "[i]n any action or proceeding involving or arising under sections . . . twenty C . . . of chapter one hundred and forty-nine, or section nine A . . . of chapter two hundred and fourteen . . ." and thus does not distinguish between the several subsections of § 20C but rather includes them all.

these employers, the union picketed a chain of "Safeway" retail food stores in Seattle which persisted in buying and selling the apples from the sources that had been struck. In the face of the statutory language which might be superficially read as outlawing this secondary boycott,[18] the Supreme Court drew a distinction between, on the one hand, picketing and propaganda appealing to the public to have no dealings with the "Safeway" stores while the stores traded in these fruits and, on the other hand, appeals to the public not to buy these fruits, even though the appeals inferentially pointed to the Safeway stores. The former type of boycott could come under the statute declaring it an unfair labor practice to "threaten, coerce, or restrain" the secondary target — here the Safeway management — with the object of "forcing or requiring" it, and so forth; but the latter type avoided the statute as it was not coercive in the statutory sense. The exemptive interpretation was reached at least in part because of serious doubts about the validity of the

[18]The text of the subsection is:

"(b) It shall be an unfair labor practice for a labor organization or its agents — . . .

"(4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is — . . .

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees  unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; . . . *Provided,* That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution; . . .."

statute in the light of the First Amendment if it was construed to sanction a restraint on picketing of the latter kind.[19] Cf. *Honolulu Typographical Union No. 37, Intl. Typographical Union, AFL-CIO* v. *National Labor Relations Bd.* 401 F. 2d 952 (D. C. Cir. 1968); *Kaynard* v. *Independent Routemen's Assn.* 479 F. 2d 1070 (2d Cir. 1973). A similar problem can arise under our § 20C (f) (see especially the words "force or require"), for it is not yet known what message was conveyed to the public by the defendants' picketing and handbill distribution: the plaintiffs' allegations indicate that the public was asked to cease altogether to shop at the supermarkets, whereas the petition for annulment of the preliminary injunctions speaks in a different sense, that the picketers were informing the customers of these supermarkets of the facts regarding the lettuce and grapes offered for sale.[20] The distinction is certainly not a simple one, as the Supreme Court freely conceded. It looks to proof. As the court indicated, however, the distinction is not unknown in the common law learning about such secondary boycotts (377 U. S. at 63-64 and n. 7 [1964]),[21] and it is compatible with the Restatement: Torts, § 801, and illustration 1, comment b; cf. § 799 (1939). See *Donnelly Garment Co.* v. *Dubinsky, supra,* 154 F. 2d at 44-45 (8th Cir. 1946); *Galler* v. *Slurzberg, supra,* 27 N. J. Super. at 149-150 (1953). The distinction is not developed in our cases; as the opinion below said, our cases seem in fact to have involved picketing and similar activities of the more direct or focused, coercive type. Cf. *Pickett* v. *Walsh,* 192 Mass. 572 (1906); *Burnham* v. *Dowd,* 217 Mass. 351 (1914); *Armstrong Cork*

---

[19]Justice Black thought the statute, properly construed, did cover this picketing; thus construed, the statute must, in his opinion, be held unconstitutional pro tanto.

[20]An injunction, if finally granted, might prohibit only such propaganda as was coercive. See *National Labor Relations Bd.* v. *Fruit & Vegetable Packers & Warehousemen, Local 760, supra,* 377 U. S. at 60, n. 3, 75-76 (1964); *Allen Bradley Co.* v. *Local Union No. 3, Intl. Bhd. of Elec. Wkrs.* 325 U. S. 797, 812-813 (1945).

[21]Where picketing is addressed to the nonunion origins of the particular goods, and does not ask the public to stop all purchases at the picketed outlet, the boycott has been characterized by some courts not as "secondary" but as a "primary" one against the goods. See *National Labor Relations Bd.* v. *Fruit & Vegetable Packers & Warehousemen, Local 760, supra,* 377 U. S. at 64, n. 7 (1964).

& *Insulation Co.* v. *Walsh,* 276 Mass. 263 (1931).

Second. In the present cases the union activity took place on property privately owned, chiefly the parking lots. The plaintiffs suggest that this establishes the defendants' culpability without more, since picketing that involves trespass is an anomaly. Yet it has been held that under given conditions picketers and handbill distributors, otherwise acting lawfully, may not be barred such access to the private areas of a shopping center as they require for effective delivery of a message which is in some way tied to the business at the center; in those circumstances the supermarkets can no more interpose their "ownership" of the parking areas as a bar to picketing than a municipality can insist on its "ownership" of the streets. But the access may be fairly conditioned and regulated. The principal authorities on the matter are the contrasting cases of *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.* 391 U. S. 308 (1968), and *Lloyd Corp.* v. *Tanner,* 407 U. S. 551 (1972). See Note, *Lloyd Corp.* v. *Tanner:* Expression of First Amendment Rights in the Privately Owned Shopping Center — A Reevaluation by the Burger Court, 22 Catholic U. L. Rev. 807 (1973). So there may be a question of fact here as to whether access to the parking and other areas is needed to enable the picketers to convey the particular information, and further fact questions as to the physical layouts which may well vary from location to location, and as to the reasonableness of the regulations proposed by the plaintiffs.[22]

The application to these cases of the procedures described by statute, with their insistence on fact finding, is thus seen to be advisable as well as required.[23]

As we hold that the preliminary injunctions were jurisdictionally improper, we need not discuss the defendants' broader contention that the injunctions violated their First

---

[22]The cases may ultimately involve other fact issues as the controlling labor statutes show.

[23]Indeed, even if the statutes were held inapplicable because no labor dispute existed, these cases might well be thought deserving of more extended and deliberate examination on the facts than they received in the Superior Court.

Amendment rights.

The stay of the order annulling the preliminary injunctions is vacated, the preliminary injunctions are annulled, and the cases remanded to the Superior Court for proceedings which comply with G. L. c. 212, § 30, and c. 214, § 9A, and which are consistent with this opinion.

*So ordered.*

BRAUCHER, J. (concurring). I join fully in the opinion and decision of the court. But I think additional comment is required about injunctions issued by judges who have no jurisdiction to issue them. For more than six months the UFW and its sympathizers have been commanded to refrain from peacefully communicating the facts of a labor dispute to the plaintiffs' customers. To be sure, counsel for the UFW apparently did not even recognize the problem, but the injunctions were continued in effect after it had been adjudicated that there was no jurisdiction to issue them.

The old-fashioned labor injunction purported to preserve the existing situation until there could be a proper trial of the merits of a claim that concerted activities of employees and their sympathizers had somehow violated the legal rights of their employers and the public. In practice, there was usually no proper trial of the merits. Long before the time for trial, the case was usually moot, since with the help of the preliminary injunction the employers had won in the world outside the court room. In effect, the courts were cavalry in the employer army.

Employees are more numerous than employers, and the remedy in a democratic system was obvious. Long ago, the battle was fought out in the political arena, and the forces of organized labor won, to the great advantage of our system of justice. In my view, as the opinion of the court fully demonstrates, this is not a marginal case. The product boycott has long been a familiar feature of the labor scene, and injunctions against it were standard illustrations of the old-fashioned labor injunction. I had thought the practice of enjoining such boycotts in labor disputes had been abolished a

generation ago, to general public satisfaction.

Even if this case could be treated as a marginal example of a labor dispute, the injunction practice followed here is nevertheless wrong. Even apart from statutes restricting labor injunctions, there is here a serious issue under the First Amendment to the Constitution of the United States. Injunctions should be issued with the expectation that they will be obeyed and, if necessary, enforced by contempt proceedings. Apparently there would have been no objection to an injunction limited to acts of harassment or intimidation; the issuance of more sweeping injunctions opened up the possibility that they might be unenforceable by reason of unconstitutional overbreadth. That risk should at least have been postponed until after trial on the merits.

In my opinion the injunctions in this case should never have been issued.

TAURO, C.J. (dissenting). At the outset, I wish to emphasize that my dissent is addressed primarily to the narrow issue of whether, *on the record before us,* a judge of the Superior Court had jurisdiction to issue temporary injunctions prior to and pending an evidentiary hearing on the issues raised in the pleadings, including the question of jurisdiction.[1] Other matters are dealt with only by way of refutation of other contentions made by UFW. In other words, on the record before us, can it be said that the judge was wrong as matter of law in issuing temporary injunctions? In my opinion, we cannot so hold and I therefore dissent from the majority opinion.

For the purpose of these cases I accept the majority's assertion that: "if the present cases were within [G. L. c. 214,] § 9A (1), then the judge of the Superior Court was without 'jurisdiction' to enter the injunctions." Here it should be noted that the defendants apparently did not consider the cases to come within the terms of the statute. They

---

[1] On the record before us I believe it is premature to discuss the First Amendment rights of the defendants. When all the facts are established it will be time enough to weigh the constitutional rights of the plaintiffs as well as those of the defendants.

did not raise that issue. It was first raised by the single justice of the Appeals Court, sua sponte.

In determining the jurisdictional question, some emphasis must be given to the present procedural posture of these suits. We have before us an appeal from an order of a single justice of the Appeals Court annulling preliminary injunctions entered by a judge of the Superior Court. Thus, we are reviewing interlocutory decrees which were entered in the Superior Court on the basis of records consisting solely of two verified bills of complaint. Because no evidence was taken, the propriety of the Superior Court judge's decisions must be determined solely on the basis of the allegations of fact contained in the bills, *Abeloff* v. *Peacard,* 272 Mass. 56, 59 (1930), without giving any consideration to the allegations of law, *Poirier* v. *Superior Court,* 337 Mass. 522, 526 (1958).

The issue before us, then, is whether these suits, as they appear from the factual allegations of the bills are, as matter of law, "case[s] involving or growing out of a labor dispute, as defined in . . . [c. 149, § 20C]." G. L. c. 214, § 9A (1). I believe that the allegations of the bills of complaint do not require a holding that there is a labor dispute between UFW and the plaintiffs. In addition, I believe that the allegations of the bills do not require rulings that these suits "grow out of" any labor dispute which might exist between the UFW and grape and lettuce growers in California, or between the UFW and a rival union, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO (Teamsters), in California. Thus, at this juncture, I would not disturb the Superior Court judge's implicit determination that he was not deprived by § 9A of jurisdiction to grant interlocutory relief in these suits.

The allegations of fact pertaining to the issue of whether these suits involve or grow out of a labor dispute include the following:[2] the defendants are members of, and represent-

---

[2] Although there are two separate bills of complaint involved, they are in substance virtually identical. Thus, this analysis, although applicable to both cases, is based on the bill filed by Demoulas Super Markets, Inc. The parenthetical references are to the paragraphs of that bill.

ative of all other members of, the UFW (par. 3); the defendants have made demands on the plaintiff that it cease purchasing grapes and lettuce which have been harvested by employees represented by the Teamsters (par. 5); the UFW has been disputing for some years with the Teamsters regarding the representation of agricultural workers in California (actually it is rather definite that the entire dispute essentially is between the two unions) (par. 5); the defendants informed the plaintiff that they would picket the plaintiff's stores until the plaintiff acceded to the defendants' demands (par. 6); the purpose of the defendants' activities is to pressure the plaintiff to cease doing business with wholesalers and growers of non-UFW picked grapes and lettuce, thereby forcing such growers to hire UFW members and to oust the Teamsters (par. 22); and the defendants have charged (falsely) that the plaintiff is selling "scab lettuce" and have asserted (falsely) that the plaintiff's employees are on strike (par. 23). Thus, the only allegation of any dispute between the plaintiff and the defendants concerns the source of certain produce sold in the plaintiff's stores. It is expressly alleged that the UFW does not represent, nor does it seek to represent, any of the plaintiff's employees (par. 4). In addition, there is no allegation that the UFW is attempting to influence those employees. All of its activities are directed at influencing the plaintiff's customers (pars. 10, 15, 18). Allegations that the defendants are engaged in a secondary boycott against the plaintiff are allegations of law and thus cannot be considered as facts. *Poirier* v. *Superior Court,* 337 Mass. 522, 526 (1958).

In addition to those just summarized, the bill of complaint contains numerous allegations of unlawful conduct of the defendants which would warrant injunctive relief. For example, it is alleged that the picketers have harassed customers and impeded their access to the stores, urging them to boycott the plaintiff's supermarkets (par. 10).[3] It is alleged

---

[3]In light of this allegation, Justice Braucher's characterization of the defendants' activities in his concurring opinion as a "product" boycott is unjustified. Whether those activities constitute a product boycott or any type of labor dispute is a factual issue, to be determined on the basis of evidence at a trial on the merits.

that, in all cases, the defendants have been trespassing on private property (pars. 13, 14, 15, 16). It is further alleged that the defendants have roamed the parking lots in such a way as to constitute a safety hazard (par. 10) and have caused a litter problem with the leaflets they distribute (par. 18). As a result of these illegal activities by the defendants, the plaintiff alleges that it has suffered "substantial damages to its business and an irreparable loss of many customers" (par. 24).

In view of these allegations of fact, it cannot be said, as matter of law, that the judge was wrong in concluding that this suit was not one "involving or growing out of a labor dispute." See *Bosse* v. *Leonard & Barrows Shoe Co.* 343 Mass. 207 (1961). Moreover, the bill on its face makes out a strong case for injunctive relief. The injuries alleged by the plaintiff constitute substantial harm to its business interests by loss of its customers to competing markets. Here it is well to emphasize that a preliminary injunction serves primarily to maintain the status quo pending a full evidentiary hearing on the merits. *Thayer Co.* v. *Binnall,* 326 Mass. 467, 479 (1950). "An injunction is proper to prevent the threatened extinction of a business . . . and to prevent disruption of a company's relationship with its dealers." *Engine Specialties, Inc.* v. *Bombardier Ltd.* 454 F. 2d 527, 531 (1st Cir. 1972). On the basis of this record the judge was justified in entering a preliminary injunction to prevent continuing injury to the plaintiff's business until a factual determination could be held to determine the substantial factual issues raised by the allegations. If the law were to the contrary a judge would be powerless to issue a preliminary injunction (pending evidentiary hearing) to restrain the most atrocious type of illegal conduct if the pleadings simply raised a possible issue involving a labor dispute. Common sense and logic dictate against any such rule.[4]

---

[4]Analogously, under the Federal statutes which forbid a single judge of the United States District Court from issuing an injunction until the application therefor is heard by a three-judge court (e.g., 28 U. S. C. §§ 2281-2283 [1970]), the single judge nevertheless is empowered to grant a temporary restraining order to prevent irreparable damage. 28 U. S. C. § 2284 (3) (1970). The policy reasons underlying that statutory provision apply with equal force to the situation before us.

In addition, the fact that the defendants at no time in the Superior Court and in the Appeals Court contended that this suit involved a "labor dispute" is of such significance that it bears repetition. At the hearing on the preliminary injunction they raised only the constitutional arguments and made no request for the procedural safeguards of G. L. c. 214, § 9A, or for a three-judge court.[5] The failure of the defendants to raise the issue supports the conclusion that the judge was not clearly wrong in determining that he had jurisdiction to enter an interlocutory order in this suit to afford preliminary protection in the face of serious misconduct extremely detrimental to the plaintiff.

In any case, even if the bill of complaint on its face raised the jurisdictional issue, it cannot be said that it was improper to issue the preliminary injunction. It has long been held that a trial court has "the power to preserve existing conditions while it . . . [is] determining its own authority to grant injunctive relief." *United States* v. *United Mine Wkrs. of America,* 330 U. S. 258, 293 (1947). *Ford* v. *Boeger,* 362 F. 2d 999 (8th Cir. 1966). This suit presents a bona fide question of jurisdiction. As the majority recognize, it has never been decided in Massachusetts that a secondary boycott is a "labor dispute" as defined in G. L. c. 149, § 20C (c)[6] (see

---

[5]At this stage we are reviewing only the procedural issues, not the constitutional questions. Thus, Justice Braucher's suggestion that the injunctions issued here violated the defendants' First Amendment rights should have been deferred until after a determination of the facts.

[6]In his concurring opinion, Justice Braucher asserts that this question was settled a generation ago when the "old-fashioned labor injunction" was legislatively "abolished." He thus assumes the answer to the question which is the focus of the dispute, i.e., whether this case involves a "labor dispute." Since this assertion is unsupported by citation or by analysis of the statutes, it is impossible to know the source from which Justice Braucher draws his conclusion. I suspect, however, that he is citing the right history for the wrong proposition. As I see it, the principal evil of the "old-fashioned labor injunction" was that it was used as a strikebreaking device, that is, to disrupt *primary labor disputes* between employee and employer. In the primary strike situation the effect of a preliminary injunction was devastating because it forced the strikers back to work. Even if labor subsequently won the trial on the merits it often proved most difficult to overcome for a second time the normal reluctance of the workers to endure lost wages and job insecurity resulting from a strike. Because a secondary boycott *involves no confrontation between employee and employer* and no threats to the economic well-being of those who boycott, the effect of a preliminary injunction is not nearly so devastating as in a primary strike. It is therefore unlikely that secondary boycott activity was foremost

discussion below). More importantly, it is not clear from the present record that this suit involves a secondary boycott at all. Whether the UFW is engaged in a lawful secondary boycott, an unlawful secondary boycott, or a secondary boycott at all is a factual determination that can be made only on the basis of evidence. It was not incorrect for the judge to "preserve existing conditions" until he could hear such evidence. If, at any time after the commencement of an evidentiary hearing, the judge determines that this suit does grow out of a labor dispute, then he should decline jurisdiction and vacate the preliminary injunction. The suit would then proceed de novo before a three-judge court to determine the propriety of a temporary injunction as well as the merits of the case. But until such hearing has taken place before a Superior Court judge there is no basis on the record before us for a holding that the judge's preliminary exercise of his general equitable jurisdiction was improper.

Apart from the problems raised by the majority's determination that the jurisdictional issue is ripe for our review, I also have difficulty with their conclusion that the dispute at hand, even assuming that it is clearly a "secondary boycott," is a "labor dispute" and that this suit is a case which "involve[s] or . . . grow[s] out of a labor dispute." G. L. c. 149, § 20C (a).

The statute defines "labor dispute" to include "any controversy arising out of any demand of any character whatsoever concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating . . . or seeking to arrange, terms or conditions of employment, regardless of whether the disputants stand in proximate relation of employer and employee." § 20C (c). The majority's analysis of this definition quickly glosses over

---

among the motivations of the sponsors of anti-injunction legislation. And in any event, such legislation did not "abolish" labor dispute injunctions, as asserted by Justice Braucher. It merely imposed certain procedural requirements on their issuance. Although Justice Braucher suggests otherwise, it is clear to me, and I think to the majority, that on remand a three-judge court may still issue an injunction in this case if it adheres to the procedures and makes the findings required by G. L. c. 214, § 9A.

(in a single sentence) the requirements that there be a "controversy" and a "demand" and focuses principally on the implications of the "regardless" clause. It is my belief, however, that this issue requires greater caution of analysis. There is indeed a controversy here between the plaintiff and the defendants, and that controversy certainly arises out of a "demand," that is, the UFW's demand that the plaintiff cease selling Teamster picked grapes and lettuce. But that demand is not of the type referred to in the statute: it concerns neither terms of employment nor representation of persons in negotiating. The majority attempt to elude this difficulty by looking to California and finding the required demands in the disputes between the UFW and the growers and producers of lettuce and grapes. I have two problems with this approach. In the first place, there is nothing in the record before us from which we can conclude that UFW has made demands of any character on California employers. More importantly, even if the existence of such demands were clear from the record, I do not believe that the record establishes a connection between those demands in California and the present controversy in Massachusetts of sufficient substance to require a holding that the latter grows out of the former. If the majority are correct, then the UFW could create a labor dispute simply by (for example) picketing the Massachusetts Bay United Fund in order to pressure the Fund to make a contribution in support of the union's organizing activities in California. A more sensible and logical construction would be to read the statutory definition as referring only to the "demand" which is the immediate cause of the controversy between the disputants. In the case before us, then, the operative demand is that directed by the UFW at the plaintiff. Since that demand does not concern terms of employment or involve representation in negotiating, I would conclude that there is no labor dispute between the plaintiff and the UFW.[7]

---

[7]If there is no labor dispute, then the adjuration contained in St. 1950, c. 452, § 7 cited at p. 734, *infra* of the majority opinion, is of no consequence to the resolution of the issues before us.

If there is no labor dispute between the plaintiff and the defendants, the issue then becomes whether it can be said that this suit involves or grows out of whatever labor dispute the UFW might be involved in with the growers and the rival Teamsters in California. The majority conclude that two of the alternatives of § 20C (a) apply: that the UFW and the plaintiff are both involved in the same "food industry," and that they are " 'persons participating or interested' " in a labor dispute with "conflicting or competing interests." I cannot agree with either proposition.

To say that the parties to this suit are "engaged in the same industry" is to define "industry" so broadly as to deprive the statutory language of any limiting effect whatsoever. From the bill of complaint we know that the UFW is a labor organization engaged in the representation of agricultural workers, principally in California. The plaintiff operates in Massachusetts a chain of retail supermarkets selling thousands of different products, of which the sale of grapes and lettuce amounts to less than .05% of its total gross sales. If these parties are to be deemed to be in a single industry, then the same logic would also put the plaintiff in the "same industry" as oil drillers (sale of plastic and petro-chemical products), as glassblowers (sale of bottled products), as miners (sale of aluminum foil), as lumberjacks (sale of paper products), as longshoremen, railroad engineers, and truck drivers (transportation and sale of retail goods). On the other hand, if there exists a "food industry" which binds together the plaintiff and UFW, then it also must include such disparate elements as fisheries, cattle ranches, bakeries, distilleries, restaurants, barrooms, cocktail lounges, airlines serving meals, and food concessions at athletic events. In fact, it is difficult to conceive of a labor dispute involving any business enterprise in which the plaintiff could not legitimately be embroiled under the majority's definition of "the same industry."

None of the cases cited in the majority opinion is persuasive in support of the contention that the plaintiff and UFW are engaged in the same industry. In fact, several of the

cases cited suggest the contrary conclusion in that they involve definitions of "industry" which are narrower and more concrete than the majority's amorphous "food industry." E.g., *Milk Wagon Drivers' Union, Local No. 753* v. *Lake Valley Farm Prod. Inc.* 311 U. S. 91 (1940) (dairies, drivers of milk delivery wagons, and retail outlets of milk are all in the same industry); *Donnelly Garment Co.* v. *Dubinsky,* 154 F. 2d 38 (8th Cir. 1946) (manufacturer of ladies' garments, seller of ladies' garments, and the ladies' garment union are all in the same industry); *Goldfinger* v. *Feintuch,* 276 N. Y. 281 (1937) (kosher meat supplier, kosher meat market, and butchers' union all in the same industry); and *Alliance Auto Serv. Inc.* v. *Cohen,* 341 Pa. 283 (1941) (petroleum and automobile accessory supply company, chain of automobile service stations in contractual relation with the supplier, and a union of petroleum delivery drivers all in the same industry). Each of these cases involved businesses dependent on either a single product or a narrow range of specialized products, with the retail business (the subject of the union pressure) having a direct relationship with the producing business (which is involved in the underlying labor dispute). The facts of these cases indicate also that these industries, for the most part, tend to be organized on a rather local basis. Such is not the case before us. Here, the plaintiff deals in many thousands of products other than grapes and lettuce, and apparently has no direct relationship with the California producers of those products (as they are separated in the economic chain by processors, packers, shippers, jobbers, and so forth).

Perhaps uncomfortable in its reliance on the "same industry" language, the majority look to the "more expansive" alternative of § 20C (a) which says that a case grows out of a labor dispute when it involves conflicting or competing interests in the labor dispute of persons interested therein. Unfortunately, the majority opinion contains no analysis of this alternative but merely restates the statutory language and asserts that the requirements are satisfied. I, of course, disagree. In the first place, § 20C (a) requires that the con-

flicting interests be "in" the labor dispute. The only labor dispute appearing on the present record is that in California among the UFW, the Teamsters, and the grape and lettuce growers. The single justice of the Appeals Court concluded that the plaintiff is a "neutral third party" as to that dispute. If the plaintiff has no interest at all "in" the labor dispute, then it obviously has no conflicting or competing interest therein. This also indicates that the plaintiff is not "a person participating or interested in" the labor dispute.[8] § 20C (b). Whether or not both the UFW and the plaintiff are parties against which relief is sought, it seems clear to me that the plaintiff is not engaged in the same industry in which such dispute occurs (see discussion above) nor does the plaintiff have a direct or indirect interest in such labor dispute. The majority seem to rely heavily on the word "indirect," but it cannot be read so broadly as to make meaningless the requirement that there be *some* relatively substantial and proximate interest in the labor dispute. Unless some reasonable limitation is placed on the word "indirect," it could be used to trace any number of irrational "indirect" connections to the California labor dispute. The majority's analysis of the plaintiff's "self-interest" in that dispute, i.e., that the plaintiff will gain a competitive advantage by selling less expensive non-UFW harvested produce, is entirely unsupported by the record before us. Similarly, because we know so little from the record of the true nature of the California labor disputes, the majority's quotation (fn. 15) from *Fortenbury* v. *Superior Court of Los Angeles County,* 16 Cal. 2d 405 (1940) is inapposite. We cannot assume that the plaintiff is "allying" itself with the growers. We only know that it refuses to take sides in a dispute between the Teamsters and the UFW. In fact, the only conclusion that may fairly be drawn from the record is that the plaintiff is disinterested in the source of its supply of lettuce and grapes and merely wants to ensure that it will continue to receive such produce from some source. This hardly gives the plaintiff an interest

---

[8]The final clause of § 20C (a) is redundant. If a party has a conflicting or competing interest in a labor dispute then he clearly is a person interested therein.

in the ultimate outcome of the dispute between the Teamsters and UFW concerning which will represent the California agricultural workers.

Finally, some consideration is due the majority's reliance on the Federal Norris-LaGuardia Act and the case law interpreting that act. The majority argue that several of the pertinent Massachusetts statutory provisions are substantially identical to provisions of the Federal act,[9] that the jursidictional restriction imposed by the Federal act clearly extends to suits involving secondary boycotts, and that, therefore, the Massachusetts "anti-injunction" statute should be interpreted as applying to suits involving secondary boycotts. I reject the premises upon which their argument is based.

First, while it is true that the State and Federal statutes are in some respects identical, it is also true that the Massachusetts Legislature did not import verbatim the Norris-LaGuardia Act. Particularly significant are the differences in the "definitions" sections of the State and Federal statutes. While the definitions in G. L. c. 149, § 20C, of "case . . . grow[ing] out of a labor dispute," "persons . . . interested in a labor dispute," and "labor dispute" are identical to the Federal definitions, the Massachusetts statute also contains definitions of "lawful labor dispute," "unlawful labor dispute," and "unlawful secondary boycott" not found in the Federal legislation. The inclusion of a definition of "unlawful secondary boycott" (which includes a definition of "lawful" secondary boycott) separate from the definition of "labor dispute" suggests to me that the Legislature intended that a secondary boycott is distinct from, and not an aspect of, a labor dispute. It is particularly persuasive that the Legislature distinguished secondary boycotts not only from labor disputes but from "unlawful" and "lawful" labor disputes as well. It would seem that the Legislature exhausted the possible descriptions of types of "labor disputes" without including secondary boycotts. Thus, court decisions applying Federal law which conclude

[9]General Laws c. 214, § 9A, and c. 149, § 20C (a)-(c), are substantially identical to 29 U. S. C. § 101 and § 113 (a)-(c) (1970), respectively.

that secondary boycotts are "labor disputes" are not persuasive in interpreting Massachusetts law because of the differences in statutory contexts.

Second, the majority confidently assert that the protections of the Norris-LaGuardia Act extend to Federal suits involving secondary boycott activity. I believe that this conclusion is more doubtful than the majority suggest, and that there may at least be limitations on the type of secondary boycott activity which will be held to be a "labor dispute" under the Federal statute. For direct authority to support their conclusion, the majority rely only on a dictum by Justice Frankfurter from a decision, *Bakery Sales Drivers Local Union No. 33* v. *Wagshal*, 333 U. S. 437 (1948), in which the court held the Norris-LaGuardia Act to be inapplicable because of the absence of any labor dispute, and an opinion by Chief Judge Tuttle of the Unites States Court of Appeals for the Fifth Circuit, in which it was admitted that "there appears to be no authoritative Supreme Court holding to this effect [i.e., that secondary boycott activity is protected under the Norris-LaGuardia Act]" and which was affirmed only by an equally divided Supreme Court. *Brotherhood of R.R. Trainmen* v. *Atlantic Coast Line R.R.* 362 F. 2d 649, 653 (5th Cir. 1966), affd. by an equally divided court, 385 U. S. 20 (1966).

In addition, the majority opinion contains citations to two other Federal cases, one a decision of the Supreme Court, *Milk Wagon Drivers' Union, Local No. 753* v. *Lake Valley Farm Prod. Inc.* 311 U. S. 91 (1940), which involved a multisided dispute among two dairies, two labor unions, a coöperative association which supplied milk to the dairies, and retail sellers of milk. The defendant union of milk wagon drivers attempted to unionize certain independent milk wagon drivers and the employees of the dairies who dealt with those independent drivers. Failing this (the independent drivers and the dairy employees in fact formed their own separate union), the defendant union began to picket stores which sold milk delivered by the independent drivers. The court's opinion, however, tells us nothing about those stores

and what ties they might have had with the dairies, because those stores were not parties to the suit. The parties before the court included the dairies and the union of independent drivers as plaintiffs and the original drivers' union as defendant. That the court had little difficulty in finding a "labor dispute" among the parties before it does not necessarily signify that it would have found a labor dispute if plaintiffs had been the stores which were the subject of the picketing. Chief Judge Tuttle, at least, clearly did not believe that this decision was an "authoritive Supreme Court holding" for the proposition that a secondary boycott is a labor dispute under the Norris-LaGuardia Act since he did not even cite it in his opinion in the *Brotherhood of R.R. Trainmen* case, *supra,* at 653.

The final case interpreting the Norris-LaGuardia Act relied on by the majority is *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees of America* v. *Dixie Motor Coach Corp.* 170 F. 2d 902 (8th Cir. 1948). The court held that secondary boycott activity by the employees of a bus company directed at a bus depot which provided services to the bus company's buses did arise out of a labor dispute and was protected by the Norris-LaGuardia Act. The court asserted that the "law was firmly settled by many decisions," 170 F. 2d at 905, but supported that assertion principally with citations to the *Milk Wagon Drivers' Union* case, discussed above, and to two other Supreme Court decisions, *Lauf* v. *E. G. Shinner & Co.* 303 U. S. 323 (1938); *New Negro Alliance* v. *Sanitary Grocery Co.* 303 U. S. 552 (1938), neither of which involved secondary boycott activity at all.

Thus, there appears to be no definitive ruling that secondary boycott activity is within the scope of the Norris-LaGuardia Act. There is some authority for precisely the opposite conclusion. See, e.g., *Gomez* v. *United Office & Professional Wkrs. of America, CIO, Local 16,* 73 F. Supp. 679 (D. D. C. 1947); *Pacific Gamble Robinson Co.* v. *Minneapolis & St. Louis Ry.* 85 F. Supp. 65 (D. Minn. 1949); *Erie R.R.* v. *Local 1286, Intl. Longshoremen's Ass'n,* 117 F. Supp. 157 (W. D. N. Y. 1953); *I.P.C. Distribs. Inc.* v.

*Chicago Moving Picture Mach. Operators Union, Local 110,*
132 F. Supp. 294 (N. D. Ill. 1955). However, even if it is con-
ceded that the provisions of the Norris-LaGuardia Act (and
thus G. L. c. 214, § 9A, as well) extend to some secondary
boycott activity, there is no justification in logic or in prece-
dent for extending the reach of that act to situations, such as
the present one, where the subject of the boycott activity
(i.e., Demoulas Super Markets, Inc.) has no interest in and
no ability to influence the conduct of the primary employer
(i.e., the California grape and lettuce growers). In fact, each
of the cases relied on by the majority involved a boycott
directed either at secondary employers with close economic
ties to the primary employer or at secondary employers who
used the products of the primary employer and whose em-
ployees were members of the disputant union. For example,
the two cases the reaction to which led to the enactment of
the Norris-LaGuardia Act, *Duplex Printing Press Co.* v.
*Deering,* 254 U. S. 443 (1921), and *Bedford Cut Stone Co.* v.
*Journeymen Stone Cutters' Assn. of No. America,* 274 U.S.
37 (1927), both involved boycotts of the primary employer's
product by secondary employees who were members of the
union which was engaged in the primary labor dispute. In the
*Brotherhood of R.R. Trainmen* case, 362 F. 2d 649 (5th Cir.
1966), the court applied "traditional economic self-interest
justification concepts," *id.* at 654, in determining that a
union's boycott of a secondary employer grew out of the
union's labor dispute with the primary employer. This deter-
mination was reached *only after a factual inquiry* which
revealed that the secondary employer (which was partly
owned by the primary employer) had "aligned himself with
the primary employer in some substantial manner — . . . by
providing certain essential services and facilities to the
primary employer." *Id.* at 655. And in the *Amalgamated
Ass'n of St. Elec. Ry. & Motor Coach Employees of Amer-
ica* case, 170 F. 2d 902 (8th Cir. 1948), there was a similar
substantial alignment of the interests of the secondary
employer with those of the primary employer.

It is clear that the suit now before us presents a factual

situation quite different from those in the cases just discussed. The employees of the plaintiff are members of neither the UFW nor the Teamsters. The plaintiff, on the record before us, has no substantial economic ties with the primary employers in California. The plaintiff is disinterested in the outcome of the dispute between the Teamsters and the UFW with regard to representation of the California agricultural workers. I do not belief, therefore, that the plaintiff has that minimum stake in the dispute among the UFW, the Teamsters, and the lettuce and grape growers which would amount to an "interest" in a "labor dispute" within the intent of both the Norris-LaGuardia Act and G. L. c. 149, § 20C.

If the question were properly before us, I would conclude that properly read and construed together, G. L. c. 214, § 9A, and c. 212, § 30,[10] are inapplicable to these suits.

---

[10] I am aware that G. L. c. 212, § 30, requires a three-judge panel in "any action or proceeding involving . . . [c. 149, § 20C]." I do not believe, however, that this provision should be read to require a three-judge panel in a case which does not involve c. 214, § 9A, because it does not grow out of a labor dispute. Section 30 was inserted by St. 1959, c. 600, which was entitled, *"An Act providing for a panel of three associate justices of the superior court to act upon labor dispute cases."* Thus, the applicability of § 30 to the case before us depends, as does the applicability of § 9A of c. 214, on whether this case involves a labor dispute. To repeat, on the record before us, a decision that a labor dispute existed was not warranted.